**Peter Chow Lung SHEN, Plaintiff-Appellant,**

v.

**P. A. ESPERDY, as District Director of the Immigration and Naturalization Service, Defendant-Appellee.**

**No. 557, Docket 34212.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1970.

Decided June 8, 1970.

Martin Burroughs, New York City, for appellant.

T. Gorman Reilly, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, and Stanley H. Wallenstein, Gen. Atty., Immigration and Naturalization Service, on the brief), for appellee.

Before LUMBARD, Chief Judge, and ANDERSON, Circuit Judge, and DOOLING, District Judge.*

LUMBARD, Chief Judge:

Peter Chow Lung Shen appeals from an order granting the District Director of the Immigration and Naturalization Service's (INS) motion for summary judgment and dismissing his complaint in this declaratory judgment action to review the district director's determination that Shen was not a refugee within the scope of section 203(a) (7) of the Immigration and Nationality Act, 8 U.S.C. § 1153(a) (7) (Supp. I, 1965–66). The basis for the INS's refusal to grant Shen refugee status, and for the district court's dismissal of the complaint, was that Shen had resettled in Taiwan after fleeing from Communist China and that "nonresettled" status was a condition precedent to qualification under the statute. We agree and affirm the judgment of the district court.

## I. THE FACTS

Peter Chow Lung Shen is an alien born on the mainland of China in 1935. In 1948, at the age of thirteen, he fled the mainland with his family. Shen, his parents, and his brothers and sisters took up residence on Taiwan, where his father was engaged in the import-export business. The parents, brothers, and sisters are still on Taiwan.

From 1948 through 1954, Shen attended school on Taiwan. During 1954, he apparently completed his schooling, for he took a job as an interpreter for the United States Air Force and remained in this position until 1956.

Shen left Taiwan in 1957 to accept a position in the United States Embassy in Australia. In 1959, he left Australia for Japan, where he studied at the International Christian University for three years. Upon completion of his course of study in Japan, Shen came to the United States as a visitor for pleasure, entering this country at Honolulu, Hawaii, on November 16, 1962. He has remained here ever since. All of appellant's travel was accomplished on a passport issued and revalidated by the Nationalist Government of the Republic of China on Formosa.

The appellee INS held a deportation hearing on November 13, 1963, pursuant to section 242(b) of the Act, 8 U.S.C. § 1252(b) (1964). Shen was represented by counsel, and he conceded that he had remained in the United States past the date set for the end of his stay as a tourist—September 14, 1963. Shen further admitted that he was deportable and designated Formosa as the country to which he wished to be deported. He also applied for the privilege of voluntary departure pursuant to section 244(e) of the Act, 8 U.S.C. § 1254(e). The INS opposed this application, which was denied as a matter of discretion by the special inquiry officer. A final order of deportation was entered after this hearing on November 13, 1963. No appeal was taken from that order.

A warrant of deportation was issued the following day, but as the government's brief recites, no action was taken to enforce Shen's departure until April, 1967, because the Attorney General had declared a moratorium on deportations of Chinese nationals to the Far East. In early April, 1967, Shen was directed to surrender for deportation to Taiwan on the 14th. On April 12th, he filed an application for a stay of deportation and an application for classification as a refugee.[1]

---

* Sitting by designation.

1. In his application, Shen stated that in 1948, "I and my family fled from the oncoming Communist armies by ship to Taiwan." He also stated "I am an anti-Communist and will be persecuted, imprisoned or executed if I return to the communist controlled mainland of China." This statement was made despite the fact that Shen had earlier designated Taiwan as the place to which he wished to be deported, and that the INS's request to surrender for deportation specified Taiwan.

Shen had an interview and examination on the latter application on September 11, 1967. The district director of the INS denied the application on February 28, 1968. His opinion stated

"* * * that at the time of the subject's entry into the United States he was not a refugee from any country, nor was he fleeing from any country. Rather, he was a tourist in possession of a valid passport and a visa. Therefore, he cannot be considered a refugee as defined in Section 203(a) (7) of the Act * * *."

The district director certified Shen's appeal to the regional commissioner on March 8, 1968, and on July 5, 1968, the regional commissioner affirmed the denial of the application. The regional commissioner concluded in his opinion that

"the applicant was firmly resettled in Taiwan and, as a consequence, is not a refugee within the scope of Section 203(a) (7) of the Act since after he fled Mainland China he became firmly resettled in Taiwan."

Thereafter, Shen initiated a declaratory judgment action in the Southern District of New York to review the district director's denial of the application for classification as a refugee. Judge Tenney granted the district director's motion for summary judgment and dismissed the complaint, stating in his opinion of September 30, 1969, that the "facts amply demonstrate the 'firm resettlement' of [Shen] in Taiwan and, as a matter of law, it cannot be said that the finding of the District Director was arbitrary or discriminatory."

Judge Tenney stayed deportation pending appeal, upon stipulation of the parties.

## II. APPELLANT'S STATUTORY ARGUMENT: CHANGES IN IMMIGRATION LAWS AND THE CONCEPT OF "FIRM RESETTLEMENT"

Appellant's claim that the district director's denial of his application was erroneous is bottomed on a comparison of the language of the present Immigration and Nationality Act (hereinafter the Act) and predecessor statutes. Section 203(a) (7) of the Act, under which Shen made his application, states:

"(a) Aliens who are subject to the numerical limitations specified in section 1151(a) [§ 201(a)] shall be allotted visas or their conditional entry authorized, as the case may be, as follows:

* * * * * *

"(7) Conditional entries shall next be made available by the Attorney General, pursuant to such regulations as he may prescribe and in a number not to exceed 6 per centum of the number specified in section 1151(a) (ii) [§ 201(a) (ii)], to aliens who satisfy an Immigration and Naturalization Service officer at an examination in any non-Communist or non-Communist-dominated country, (A) that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, and (iii) are not nationals of the countries or areas in which their application for conditional entry is made; or (B) that they are persons uprooted by catastrophic natural calamity as defined by the President who are unable to return to their usual place of abode * * *. *Provided*, that immigrant visas in a number not exceeding one-half the number specified in this paragraph may be made available, in lieu of conditional entries of a like number, to such aliens who have been continuously physically present in the United States for a period of at least two years prior to application for adjustment of status."

Shen argues that this section is the "direct descendant" of two earlier stat-

utes, and that section 203(a) (7) was intended to change the policy expressed in these earlier enactments with regard to denial of refugee status to an alien who has been firmly resettled in another nation prior to making application to the United States. The government also bases much of its argument on the prior legislation. It contends that the successive statutes embody a consistent immigration policy including the concept of firm resettlement. Although our examination of the statutes cited to us leads us to the conclusion that much, if not all, of the legislation can be described as temporary in character and responsive to specialized refugee problems, we agree, on balance, with the government's position.

The first of the earlier statutes relied on by Shen is the Displaced Persons Act of 1948, 62 Stat. 1009 (June 25, 1948), which provided for the entry of persons displaced by World War II and the ensuing Communist domination of Eastern Europe. Under the Displaced Persons Act, an alien, once in the United States, could adjust his status to that of a legal residence by being designated a "displaced person," regardless of the manner of entry into this country. "Displaced person" was defined, inter alia, as one "who has not been firmly resettled." [2]

The second predecessor statute, Shen argues, is the Refugee Relief Act of 1953, 67 Stat. 400 (Aug. 7, 1953) which permitted the admittance of 214,000 refugees within a three-and-one-half-year period. It defined the term "refugee" as

"* * * any person in a country or area which is neither Communist nor Communist-dominated, who because of persecution, fear of persecution, natural calamity or military operations is out of his usual place of abode and unable to return thereto, who has not been firmly resettled, and who is in urgent need of assistance for the essentials of life or for transportation." [3]

There are other statutes in the chain of legislation, but as the government concedes, the Refugee Relief Act of 1953 was the last enactment to incorporate the "firm resettlement" language in defining who was eligible for adjustment to legal residence as a refugee. The Act of 1957, P.L. No. 85–316, 71 Stat. 639 (Sept. 11, 1957), a measure which in effect allowed two more years to carry out the work begun under the Refugee Relief Act of 1953, defined "refugee-escapee" as

"any alien who, because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee (A) from any Communist, Communist-dominated, or Communist-occupied area, or (B) from any country within the general area of the Middle East, and who cannot return to such area, or to such country, on account of race, religion, or political opinion." [4]

The next statute was the Fair Share Law of 1960, P.L. No. 86–648, 74 Stat. 504 (July 14, 1960), the immediate predecessor of the present Act. Section 1 of the Fair Share Law authorized the Attorney General to "parole" into this country "an alien refugee-escapee defined in Section 15(c) (1) of the Act of September 11, 1957" (71 Stat. 643),[5] if such alien

"(1) applies for parole while physically present within the limits of any country which is not Communist, Communist-dominated, or Communist-occupied, (2) is not a national of the area in which the application is made, and (3) is within the mandate of the United Nations High Commissioner for Refugees." [6]

These provisions of the Fair Share Law of 1960, including the quoted portion, were extended indefinitely by section 6

2. Section 2(c) of the Displaced Persons Act of 1948.

3. Section 2(a) of the Refugee Relief Act of 1953.

4. Section 15(c) (1).

5. See text accompanying note 4, *supra.*

6. Section 1, 74 Stat. 504 (July 14, 1960).

of the Refugee Assistance Act of 1962, P.L. No. 87–510, 76 Stat. 121 (June 28, 1962). On October 3, 1965, when the present section 203(a) (7) was added to the Immigration and Nationality Act, the Fair Share Law provisions were repealed. It is clear from the opinions of the INS in this case, and in others cited to us, that the INS has, throughout the period encompassed by these statutes, regarded the concept of firm resettlement as important in determining whether aliens are entitled to adjustment to legal status as refugees.[7]

The government has also called our attention to a recent Ninth Circuit decision which supports Shen's position. In Yee Chien Woo v. Rosenberg, 419 F.2d 252 (9th Cir. 1969), petition for certiorari filed, 38 U.S.L.W. 3466 (May 26, 1970), a case almost identical to the instant one,[8] the Ninth Circuit held that in light of the chain of enactments described above, section "203(a) (7) does not require, as a condition precedent to conditional entry, that the alien be 'not firmly resettled elsewhere.'" *Id.* at 253–254. The Ninth Circuit went on to state that "[t]he nature of the relationship of the refugee to an intermediate host country to which he has fled from his home country and in which he has found temporary asylum is a necessary consideration under this and prior refugee relief acts." *Id.* at 254. The court then reviewed briefly the statutes discussed above and concluded that

"[w]hether [Yee Chien Woo] was firmly resettled in Hong Kong is not, then, relevant. What is relevant is that he is not a national of Hong Kong (or the United Kingdom); that he is a national of .no country but Communist China and as a refugee from that country remains stateless."

7. See e. g., Matter of Rodriguez, 11 I&N Dec. 901 (1966); Matter of Sun, 12 I&N Dec. 36 (1966); Matter of Moy, 12 I&N Dec. 117 (1967); Matter of Moy, 12 I&N Dec. 121 (1967); Matter of Ng, 12 I&N Dec. 411 (1967); Matter of Chai, 12 I&N Dec. 81 (1967); Matter of Hung, 12 I&N Dec. 178 (1967).

8. Yee Chien Woo v. Rosenberg, *supra*, was a declaratory judgment suit to review the Los Angeles INS district director's denial of an application under section 203(a) (7). Yee Chien Woo was a native of the mainland of China, and in 1952 his substantial business and financial holdings were confiscated by the Communist government. The Communist government granted him permission to leave for a foreign visit, on condition that he would return. In 1953 he went to Hong Kong, and never returned to Communist China. He began a trading business in Hong Kong, married, and had a son. In 1959, he was admitted to the United States as a temporary visitor for business purposes, to operate a concession at the International World's Fair in Portland, Oregon. Later in 1959, he returned to Hong Kong. In May, 1960, he reentered the United States as a business visitor in connection with the San Diego Fair and International Trade Mart. Thereafter, he remained in this country. His temporary stay expired in March of 1966, but by this time his wife and son had joined him by entering the United States as visitors for pleasure from Canada. Deportation proceedings were commenced, and on March 8, 1966, Yee Chien Woo and his family were granted voluntary departure. They did not depart, but on that date applied for classification as refugees under section 203(a) (7).

The district director denied the application and the regional commissioner affirmed. In the declaratory judgment action, it was recited that Yee Chien Woo had expressed opposition to Communism and fear of persecution if he should have to return to Communist China. It was also made clear that he possessed a valid Hong Kong Certificate of Identity and that that was sufficient documentation for him to return to Hong Kong.

The district court held that Yee Chien Woo "was never 'firmly resettled' and still qualifies as a refugee under the terms of section 203(a) (7). Accordingly, the District Director erred in denying plaintiff's application." 295 F.Supp. 1370, 1372 (S.D. Cal.1968). The district court also noted that "[i]n reality, plaintiff had no choice but to stay in Hong Kong until he could afford immigration as a refugee," and that "[h]is feeling that Hong Kong might not be a safe place to return to is not unfounded." Id.

In so far as Yee Chien Woo v. Rosenberg holds that the concept of firm resettlement is irrelevant to applications made under section 203(a) (7) of the Act, we must disagree with the Ninth Circuit.

### III. SECTION 203(a) (7): INTERPRETATION AND CONGRESSIONAL INTENT

■ Shen's application was made under the proviso to section 203(a) (7) that states "immigrant visas * * * may be made available, in lieu of conditional entries * * * to such aliens who have been continuously physically present in the United States for a period of at least two years prior to application for adjustment of status." The words "such aliens" in the proviso obviously refers back to the description of aliens eligible for conditional entries into the United States. In pertinent part, this earlier portion of the section provides that conditional entries shall go

"to aliens who satisfy an Immigration and Naturalization Service officer at an examination in any non-Communist or non-Communist-dominated country, (A) that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area * * *, and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, and (iii) are not nationals of the countries or areas in which their application for conditional entry is made; or (B) that they are persons uprooted by catastrophic natural calamity as defined by the President who are unable to return to their usual place of abode * * *."

As noted above, in Yee Chien Woo v. Rosenberg the Ninth Circuit seized on the phrase "not a national" in section 203(a) (7) (A) (iii) and held that these words were "substituted" for the language about firm resettlement which had appeared in the Displaced Persons Act of 1948 and the Refugee Relief Act of 1953. This interpretation of section 203(a) (7) (A) (iii) as a pervasive test to be applied to all aliens—whether they seek conditional entries under the first portion of the section or immigrant visas under the proviso—is not correct. Under regulations promulgated by the Attorney General, conditional entry under section 203(a) (7) is available only after application to INS officers in one of seven countries: Austria, Belgium, France, Germany, Greece, Italy, or Lebanon. 8 C.F.R. § 235.9 (1970). Given this regulation, the broadest scope which the "not a national" language can be afforded is that it merely states that applicants for conditional entries cannot be nationals of one of these seven nations within which they have applied. Thus, we view the language of section 203(a) (7) (A) (iii) as relevant only to those aliens who apply for conditional entries in one of these seven nations. It does not apply in any way to one in Shen's position—or, for that matter, in Yee Chien Woo's—who applies for an immigrant visa after spending more than two years in this country.[9]

For persons in Shen's position, the regulations applicable are drawn under section 245 of the Act, 8 U.S.C. § 1255, and are entitled "Adjustment of Status to That of Persons Admitted for Perma-

---

9. The absurdity of applying the "not a national" language to aliens applying under the proviso is demonstrated by the fact that the requirement would always be satisfied by an alien who had overstayed his temporary admission to the United States. The Ninth Circuit interpreted the Act to say, in effect, "not a national of the intermediate host country to which he has fled from his home country." See 419 F.2d at 254. However, here the language of the Act is quite clear; section 203(a) (7) (A) (iii) states "not nationals of the countries or areas in which their application for conditional entry is made." Even if one could properly construe this language as applicable to applicants under the proviso, it would dictate merely that the alien could not be eligible if he was a national of the United States, the country in which his application was made.

nent Residence," 8 C.F.R. Part 245 (1970) [especially § 245.4]. These regulations do not and logically cannot make reference to the "not nationals" language of section 203(a) (7) (iii).

Thus, aliens such as Shen who apply for immigrant visas from within the United States must "satisfy an Immigration and Naturalization Service Officer" that "they have fled" from a Communist nation because of political opinion and that because of such opinion they are "unable or unwilling to return." Sections 203(a) (7) (A) (i), (ii), 8 U.S. C. §§ 1153(a) (7) (A) (i) and (ii). The words "satisfy an Immigration and Naturalization Service Officer" strongly imply discretion, and in order to review properly the exercise of this discretion it is imperative that we examine in somewhat greater detail the predecessor statutes and the legislative history of the present section 203(a) (7) itself.

The Ninth Circuit found resort to legislative history unnecessary and unenlightening, stating that

"[W]e cannot disregard the clear manifestation of Congressional intent shown by the substitution, in 1957, of the status 'not a national' for that of 'not firmly resettled' as formerly specified in the 1953 Act. Nothing in the legislative history advanced by [the government] persuades us that Congress intended this substituted language to mean anything but what it clearly says."

419 F.2d at 254. Congressional intention to make such a substitution is not at all clear. First, as we have stated, we believe that the Ninth Circuit impermissibly broadened the scope afforded the "not a national" phrase by misinterpreting it as being applicable to aliens who apply for immigrant visas as refugees from within the United States in accordance with the proviso of section 203(a) (7). Second, the 1957 legislation was a measure of "limited duration and scope

* * * allotting the 18,656 unused visas under the Refugee Relief Act [of 1953], to German expellees, persons of Dutch ethnic origin, and 'refugee-escapees.' " 1 Gordon & Rosenfield, Immigration Law and Procedure, 2–130 (1969). As such, it is hardly accurate to point to this particular piece of legislation as a statute intended by Congress to effect a major change in the criteria to be used in assessing refugees' applications for adjustment of status.

The Fair Share Law of 1960, in effect from 1960 to 1965, might be viewed as more significant, but there is little evidence in the legislative history that it was intended to abrogate or abandon the concept of firm resettlement. In the first place, under the Fair Share Law application by refugee-escapees [10] for parole ["conditional entry" under the present section 203(a) (7)] into the United States was limited to the same seven nations listed earlier in this opinion.[11] See Tai Mui v. Esperdy, 371 F.2d 772, 779, 780 (2d Cir. 1966), cert. denied, 386 U.S. 1017, 87 S.Ct. 1372, 18 L.Ed.2d 454 (1967). Thus, the phrase "not a national" is subject to the same limited reading as it is in the present section 203(a) (7).

Moreover, the Fair Share Law itself was a rather limited and specialized piece of legislation, designed to implement our paticipation in the United Nations World Refugee Year. The Report of the Senate Judiciary Committee on the joint resolution which included the Fair Share Law provisions, H.J.Res. 397, 86th Cong., 2d Sess. (1960), states that the principal purpose of the resolution was "to enable the United States to participate in the resettlement of certain refugee-escapees by granting the Attorney General special authority * * * to parole into the United States refugees * * * who are under the mandate of the United Nations High Commissioner for Refugees in a number not to exceed

---

10. This term, as stated earlier, was used as defined in section 15(c) (1) of the 1957 Act. See text accompanying note 4, supra.

11. See text accompanying note 9, supra.

25 percent of the total number of any such similar refugees resettled during stated periods of time in countries other than the United States * * *." S.Rep.No.1651, 86th Cong., 2d Sess. (1960) at 3, 2 U.S.Code Cong. & Admin.News, p. 3124 (1960). That this statute was not considered by Congress as a general statement of immigration policy is demonstrated by the following exchange of views, documented in the Senate Judiciary Committee's Report. In a letter of July 9, 1959, Assistant Secretary of State William B. Macomber, Jr., writing for the Secretary, noted that the State Department was concerned about the "very limited definition of refugees eligible for admission." The State Department's view was that limiting the definition to those refugees under the U. N. High Commissioner's mandate would discriminate against certain classes of refugees, "principally in the Middle East and Far East who have not been determined as falling under the aforementioned mandate * * *." Accordingly, the State Department proposed that instead of requiring that aliens be within the United Nations High Commissioner's mandate the provision should read as follows:

> "[a refugee-escapee] is any alien (A) who because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee from any Communist, Communist-dominated, or Communist-occupied area, or from any country within the general area of the Middle East, and who cannot return to such area or country on account of race, religion, or political opinion, or (B) who is out of his usual place of abode because of a natural calamity, military operations, or political upheaval, and who is unable or unwilling to return to his usual place of abode, and (C) who is in a country or area which is neither Communist nor Communist-dominated, and (D) who has not been firmly re-

settled and is in urgent need of assistance for the essentials of life."

S.Rep. No. 1651, *supra*, at 18–19, 2 U.S. Code & Admin.News, pp. 3139–40 (1960). The Senate Judiciary Committee's response was to reject the suggestion, stating "the enlargement of the scope of this legislation as suggested by the Department of State will not be conducive to the achievement of the primary aim of House Joint Resolution 397, as amended, which is to contribute to the closing of the remaining displaced persons and refugee camps in Europe, such aim coinciding with the determined camp liquidation program of the United Nations High Commissioner for Refugees." Sen.Rep. No. 1651, *supra*, at 18–19, 2 U.S.Code Cong. & Admin.News, p. 3140 (1960). This exchange indicates that the Fair Share Law was also a measure "of limited duration and scope." 1 Gordon & Rosenfield *supra*, at 2–130.

Thus the definition of eligibility under the Fair Share Law remained pegged to aliens who were under the Mandate of the United Nations High Commissioner, and that mandate extended "only [to] those refugees who do not have the rights and obligations of nationals in the country in which they reside."[12] Sen.Rep. No. 1651, *supra*, 2 U.S.Code Cong. & Admin.News, p. 3143 (1960). While this definition might be viewed as supportive of Shen's position and the Ninth Circuit's approach, we believe that the specialized purpose of the Fair Share Law—participation in the World Refugee Year in order to close out the D.P. camps of Europe—cuts against any interpretation of this enactment as a pervasive declaration of immigration policy.

In 1963 and 1965, however, the Kennedy and Johnson Administrations submitted many proposals for reform of the nation's basic immigration law, the McCarran-Walter Act of 1952. Some of the proposed modifications were directed at refugee problems. The Administra-

---

12. For a discussion of the formula to be used in arriving at the number of refugees to be admitted, see Sen.Rep. No. 1651, *supra*, at 22–25.

tion bills [13] provided that the President could reserve up to 10 per cent of the reserve quota of visas for refugees who would not come within the Fair Share Law. As explained by a State Department official, "[m]ost refugees are uprooted or flee from persecution suddenly with no opportunity to plan for movement to a new home through normal immigration procedures. In crises which create large numbers of refugees, the political interest of the United States may make it desirable that this country take a share of these new refugees." [14] Accordingly, section 13 of the Administration-sponsored bill was intended to remove the requirement that refugees be within the mandate of the United Nations High Commissioner. The House, although concerned about the number of entrants if the President was allowed this flexibility with 10 per cent of the reserve quota of visas, nevertheless accepted the basic premise of continuing to admit refugees and giving the Executive authority to deal swiftly with new natural or political upheavals. Thus, it cut the number of conditional entries available under what became section 203(a) (7) to 10,200. See H.R.Rep. No. 745, 89th Cong., 1st Sess. (1965) at 15, U.S.Code Cong. & Admin.News, p. 3328.

The Senate Committee on the Judiciary amended the bill passed by the House by adding to it what is now section 203(a) (7) (B)—the provision allowing entry of aliens uprooted by catastrophic natural calamity. In discussing the addition of this provision, the Senate Judiciary Committee Report cited and quoted in full section 2(a) of the Refugee Relief Act of 1953, which included a "natural calamity" provision and the language "[one] who has not been firmly resettled" in defining "refugee." [15] Sen.Rep. No. 748, 89th Cong., 1st Sess. (1965) at 16.

Another theme important to this case emerges from the 1965 congressional debates: the thought that repeal of the Fair Share Law and its reference to the United Nations High Commissioner's mandate would once "again permit the United States to determine who is or who is not a refugee." H.R.Rep. No. 745, *supra*, at 15. See also remarks of Senator Edward M. Kennedy concerning H.R. 2580 [the bill passed by the House on August 25, 1965, and referred to and passed by the Senate on September 22, 1965, with some changes, including addition of the natural calamity provision] 111 Cong.Rec. 24,227, 89th Cong., 1st Sess. (Sept. 17, 1965). This goal seems significant to us, particularly in light of the language in the Act that an alien seeking adjustment of status under section 203(a) (7) must satisfy an INS officer as to his eligibility. In passing on refugee applications, officers have considered firm resettlement for many years.[16] Moreover, since section 203(a) (7) was adopted, the INS has continued to determine whether aliens were firmly resettled, and this practice has been reported on the floor of Congress.[17]

13. H.R. 2580, 89th Cong., 1st Sess. (1965); S. 500, 89th Cong., 1st Sess. (1965).

14. Testimony of Abba P. Schwartz, Administrator, Bureau of Security and Consular Affairs, in Hearings before Senate Subcommittee on Immigration of Senate Judiciary Committee on S. 500, at 173. Mr. Schwartz' point was reiterated in the House Judiciary Committee's Report, H.R.Rep. No. 745, *supra*, at 15, which stated:

"This new section of the law will permit the President to act immediately, if the situation so requires, to come to the aid of refugees as defined in this bill."

15. See text accompanying note 3, *supra*.

16. See cases cited note 7, *supra*, and note 19, *infra*.

17. See remarks of Congressman Feighan, 113 Cong.Rec. 22787–88, 90th Cong., 1st Sess. (Aug. 16, 1967), which includes reading into the record a report of Raymond F. Farrell, Commissioner of INS, setting forth statistics on the operation of section 203(a) (7) for the six-month period ending June 30, 1967. The report shows that 53 applications were rejected during that period under "established screening procedures" because the aliens were "firmly settled."

Congress has not given any indication that this administrative practice and interpretation are contrary to its purpose. In accord with the recognized standard for review of such administrative action, we ought to give weight to a contemporaneous construction of a statute by those charged with its administration. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Chrysler Corporation v. Tofany, 419 F.2d 499, 511–12 (2d Cir. 1969).

We further hold that this construction of section 203(a) (7) is logical and completely consonant with the overall scheme embodied in that section. Most important here is the fact that the flexibility afforded to the Executive in admitting refugees suffering from comparatively recent crises—whether political or natural—would be all but destroyed if Shen's position were accepted. The government is quite correct in asserting that the 10,200 entries or visas per year afforded under section 203(a) (7) could be quickly exhausted by aliens who have found relief by resettlement in new homes but who nevertheless still wish to immigrate to the United States. As the government points out, if this were allowed to happen "the real refugee, the homeless, will go wanting." [18]

Finally, there are several decisions, including at least two at the district court level in California which predate Yee Chien Woo v. Rosenberg, supra, which have held that once an alien stops fleeing and becomes integrated in another nation (i.e., firmly resettled) he is outside the scope of congressional concern because he is no longer a refugee.[19] At first glance, it might seem inappropriate to impose such a time-frame upon applications under section 203(a) (7) since that section does not even use the key word "refugee." However, as we have pointed out, the legislative history is replete with direct assertions that this section deals with refugees.[20] We agree with the cases which define "refugee" as one who is still in flight. We do not believe that Congress ever meant that once someone has been a refugee he remains one for the rest of his life, regardless of intervening events.

Shen's other claims that denial of his application was discriminatory and that granting summary judgment and dismissing his complaint on the government's motion were improper are without merit.

Affirmed.

See also, a similar report read into the record by Congressman Feighan, 114 Cong.Rec. 1177–78, 90th Cong., 2d Sess. (Jan. 29, 1968), for the six-month period ending December 31, 1967.

18. An argument of this type was rejected by the Ninth Circuit, but from that court's opinion it is unclear if the government pressed it in terms of the flexibility which was to be afforded to the Executive in dealing with sudden crises as they arise. The opinion of the Ninth Circuit states:

"The Service insists that Congress cannot have intended that 'once a refugee'; that this 'literally would make thousands upon thousands of aliens, formerly refugees and firmly resettled in host countries eligible to apply for conditional entry.' But Congress appears to have met this possibility by specifically limiting [to 10,200] the number of those who can claim conditional entry

under the 'Seventh Preference.' " 419 F.2d at 254.

Whatever the propriety of this rejection of the government's "floodgates" argument in Yee Chien Woo v. Rosenberg, we find the more sophisticated argument presented to us on the need for Executive flexibility, supported as it is in the legislative history, most persuasive.

19. See Min Chin Wu v. Fullilove, 282 F. Supp. 63 (N.D.Cal.1968); Ou Young v. District Director, Civil No. 68–1563–F (S.D.Cal. Dec. 24, 1968); Yee Chien Woo v. Rosenberg, 295 F.Supp. 1370 1372 (S.D.Cal.1968). Cf. Leong Leun Do v. Esperdy, 309 F.2d 467 (2d Cir. 1962) at 471–472 (discussing "resettlement" under the Refugee Relief Act of 1953; id. at 475–477) (Lumbard, J., concurring). See also S.Rep. No. 748, 89th Cong., 1st Sess. 16, 17 (1965).

20. See text accompanying notes 13–16, supra.