## ROSENBERG, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE
## *v.* YEE CHIEN WOO

No. 156.   Argued February 23, 1971—Decided April 21, 1971

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, WHITE, and BLACKMUN, JJ., joined. STEWART, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined, *post*, p. 58.

*Charles Gordon* argued the cause for petitioner. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Wilson, Jerome M. Feit, Beatrice Rosenberg, Paul C. Summitt,* and *George W. Masterton.*

*Gordon G. Dale* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondent, Yee Chien Woo, is a native of mainland China, a Communist country, who fled that country in 1953 and sought refuge in Hong Kong. He lived in Hong Kong until 1959 when he came to the United States as a visitor to sell merchandise through a concession at a trade fair in Portland, Oregon. After a short stay, he returned to Hong Kong only to come back to the United States in 1960 to participate in the San Diego Fair and International Trade Mart to promote his Hong Kong business. Thereafter he remained in the United States although he continued to maintain his clothing business in Hong Kong until 1965. In 1965 respondent's wife and son obtained temporary visitor's permits and joined him in this country. By 1966 all three had overstayed their permits and were no longer authorized to remain in this country. After the Immigration and Naturalization Service began deportation proceedings, Yee Chien Woo applied for an immigrant visa claiming a "preference"

as an alien who had fled a Communist country fearing persecution as defined in § 203 (a)(7) of the Immigration and Nationality Act of 1952, as amended, 79 Stat. 913, 8 U. S. C. § 1153 (a)(7) (1964 ed., Supp. V).

The District Director of the Immigration and Naturalization Service denied respondent's application because "the applicant's presence in the United States ... was not and is not now a physical presence which was *a consequence of his flight in search of refuge* from the Chinese mainland." (Emphasis added.) On appeal within the Immigration and Naturalization Service, the decision of the District Director was affirmed by the Regional Commissioner on the ground that "Congress did not intend that an alien, though formerly a refugee, who had established roots or acquired a residence in a country other than the one from which he fled would again be considered a refugee for the purpose of gaining entry into and or subsequently acquiring status as a resident in this, the third country."

Respondent then sought review in the United States District Court for the Southern District of California which reversed the District Director's determination. That court, without ever deciding whether resettlement would have barred respondent's claim, found as a matter of fact that he had never firmly resettled in Hong Kong.[1] The Immigration and Naturalization Service appealed to the United States Court of Appeals for the Ninth Circuit. That court affirmed the District Court because in its view whether Yee Chien Woo was "firmly resettled" in Hong Kong was "irrelevant" to

---

[1] "Without expressing any opinion as to why Congress chose to omit the 'firmly resettled' provision in the amendments to the Refugee Relief Act of 1953, this court finds that plaintiff was never 'firmly resettled' and still qualifies as a refugee under the terms of section 203 (a)(7). Accordingly, the District Director erred in denying plaintiff's application." 295 F. Supp. 1370, 1372 (1968).

consideration of his application for an immigration quota. It stated:

> "Whether appellee was firmly resettled in Hong Kong is not, then, relevant. What is relevant is that he is not a national of Hong Kong (or the United Kingdom); that he is a national of no country but Communist China and as a refugee from that country remains stateless." 419 F. 2d 252, 254 (1969).

The Court of Appeals for the Second Circuit in a case decided after the Ninth Circuit decision below faced the issue of the relevancy of resettlement and expressly declined to follow the Ninth Circuit interpretation of the statute.[2] *Shen* v. *Esperdy,* 428 F. 2d 293 (1970). We granted certiorari in this case to resolve the conflict. 400 U. S. 864 (1970).

Since 1947 the United States has had a congressionally enacted immigration and naturalization policy which granted immigration preferences to "displaced persons," "refugees," or persons who fled certain areas of the world because of "persecution or fear of persecution on account of race, religion, or political opinion." Although the language through which Congress has implemented this policy since 1947 has changed slightly from time to time, the basic policy has remained constant—to provide a haven for homeless refugees and to fulfill American responsibilities in connection with the International Refugee Organization of the United Nations. This policy is currently embodied in the "Seventh Preference" of § 203

---

[2] The Second Circuit dealt at length with the Ninth Circuit's opinion in this case, concluding:

"In so far as Yee Chien Woo v. Rosenberg holds that the concept of firm resettlement is irrelevant to applications made under section 203 (a)(7) of the Act, we must disagree with the Ninth Circuit." 428 F. 2d 293, 298 (1970).

(a) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1153 (a) (1964 ed., Supp. V), which provides in pertinent part:

> "(a) Aliens who are subject to the numerical limitations specified in section 201 (a) shall be allotted visas or their conditional entry authorized, as the case may be, as follows:
>
> .        .        .        .        .
>
> "(7) [A]liens who satisfy an Immigration and Naturalization Service officer at an examination in any non-Communist or non-Communist-dominated country, (A) that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, . . . and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, and (iii) are not nationals of the countries or areas in which their application for conditional entry is made . . . ."

The Ninth Circuit supported its conclusion that the "firmly resettled" concept was irrelevant under § 203 (a) (7) upon two bases. First, the court noted that the "firmly resettled" language was first introduced in the Displaced Persons Act of 1948, 62 Stat. 1009, and was then expressly stated in the Refugee Relief Act of 1953, 67 Stat. 400, both of which are predecessors of the present legislation.[3]  However, when the Refugee Relief Act of

---

[3] The Displaced Persons Act of 1948 defined a "displaced person" by reference to the Constitution of the International Refugee Organization (IRO) and to persons who were of concern to that organization. Persons ceased to be of concern to the IRO when they acquired a new nationality or by their firm establishment. S. Rep. No. 950, 80th Cong., 2d Sess., 68.

The Refugee Relief Act of 1953 provided: " 'Refugee' means any person in a country or area which is neither Communist nor Com-

1953 was extended in 1957, the "firmly resettled" language was dropped in favor of a formula defining an eligible refugee as "any alien who, because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee" from certain areas. 71 Stat. 643. The 1957 Act was then followed by the Fair Share Refugee Act of 1960, 74 Stat. 504, which defined "refugee" as one "not a national of the area in which the application is made, and (3) [who] is within the mandate of the United Nations High Commissioner for Refugees." Finally, the present legislation was added to the Immigration and Nationality Act in 1965. From the 1957 abandonment of the words "firmly resettled" the Court of Appeals determined that Congress had purposely rejected "resettlement" as a test for eligibility for refugee status.

Second, the Ninth Circuit gave particular significance to the statutory requirement that refugees "are not nationals of the countries or areas in which their application for conditional entry is made." Thus, in the court's view, Congress intended to substitute the "not nationals" requirement for the not "firmly resettled" requirement. For substantially the reasons stated by the Second Circuit in *Shen* v. *Esperdy*, 428 F. 2d 293 (1970), we find no congressional intent to depart from the established concept of "firm resettlement" and we do not give the "not nationals" requirement of § 203 (a)(7)(A)(iii) as broad a construction as did the court below.

While Congress did not carry the words "firmly resettled" over into the 1957, 1960, and 1965 Acts from the

---

munist-dominated, who because of persecution, fear of persecution, natural calamity or military operations is out of his usual place of abode and unable to return thereto, who has not been firmly resettled, and who is in urgent need of assistance for the essentials of life or for transportation." Refugee Relief Act of 1953, § 2 (a), 67 Stat. 400.

earlier legislation, Congress did introduce a new require-
ment into the 1957 Act—the requirement of "flight."
The 1957 Act, as well as the present law, speaks of persons
who have *"fled"* to avoid persecution.[4]  Both the terms
"firmly resettled" and "fled" are closely related to the
central theme of all 23 years of refugee legislation—the
creation of a haven for the world's homeless people.
This theme is clearly underlined by the very titles of the
Acts over the years from the Displaced Persons Act in
1948 through the Refugee Relief Act and the Fair Share
Refugee Act of 1960.  Respondent's reliance on the Fair
Share Refugee Act of 1960 to show that Congress aban-
doned the "firmly resettled" concept is particularly mis-
placed because Congress envisioned that legislation not
only as the means through which this country would ful-
fill its obligations to refugees, but also as an incentive to

---

[4] The 1957 amendments to the Refugee Relief Act of 1953 did not
mark any great change in American refugee policy.  Congress was
primarily concerned with distributing 18,656 visas that were originally
authorized under the 1953 Act but remained unissued when that Act
expired on January 1, 1957.  The Senate report on the bill states
the congressional intent: "It is the intention of the committee that
the distribution of this remainder will be made in a fair and equitable
manner, without any prescribed numerical limitations for any par-
ticular group, according to the showing of hardship, persecution, and
the welfare of the United States."  S. Rep. No. 1057, 85th Cong., 1st
Sess., 6.  Indeed, after the 1957 Act became law the Immigration
and Naturalization Service promulgated and uniformly administered
regulations which specifically referred to the resettlement requirement.
   "§ 44.1  *Definitions.*

.          .          .          .          .

"(f) 'Refugee' means any person in a country or area which is
neither Communist nor Communist-dominated, who because of per-
secution, fear of persecution, natural calamity or military operations
is out of his usual place of abode and unable to return thereto, who
has not been firmly resettled and who is in urgent need of assistance
for the essentials of life or for transportation."  22 CFR § 44.1
(1958), 22 Fed. Reg. 10826 (Dec. 27, 1957).

other nations to do likewise.[5]   Far from encouraging re-settled refugees to leave one secure haven for another, the Act established United States quotas as a percentage—25%—of the refugees absorbed by all other cooperating nations.   The Fair Share Refugee Act, like its successor and predecessors, was enacted to help alleviate the suffering of homeless persons and the political instability associated with their plight.   It was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives.   Nor could Congress have intended to make refugees in flight from persecution compete with all of the world's resettled refugees for the 10,200 entries and permits afforded each year under § 203 (a)(7).   Such an interpretation would subvert the lofty goals embodied in the whole pattern of our refugee legislation.

In short, we hold that the "resettlement" concept is not irrelevant.   It is one of the factors which the Immigration and Naturalization Service must take into account to determine whether a refugee seeks asylum in this country as a consequence of his flight to avoid persecution.   The District Director applied the correct legal

---

[5] Careful study of the Fair Share Refugee Act demonstrates that resettlement was relevant even under that legislation.   In order to qualify as a refugee under the Fair Share Refugee Act, the alien had to be "within the mandate of the United Nations High Commissioner for Refugees."   Specifically excluded from the Commissioner's competence was a person who "is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country . . . ."   Statute of the Office of the United Nations High Commissioner for Refugees, c. II, par. 7 (b), contained in G. A. Res. 428 (V), December 14, 1950.   It appears that under this statute, Yee Chien Woo probably would not have fallen within the Commissioner's mandate because although he was not a Hong Kong (or British) national, he possessed valid Hong Kong identity papers enabling him to return and live there.

standard when he determined that § 203 (a)(7) requires that "physical presence in the United States [be] a consequence of an alien's flight in search of refuge," and further that "the physical presence must be one which is reasonably proximate to the flight and not one following a flight remote in point of time or interrupted by intervening residence in a third country reasonably constituting a termination of the original flight in search of refuge." [6]

Finally, we hold that the requirement of § 203 (a)(7) (A)(iii) that refugees not be "nationals of the countries or areas in which their application for conditional entry is made" is not a substitute for the "resettlement" concept. In the first place that section is not even applicable to respondent. He was applying for an immigrant visa, not a conditional entry permit to which part (A)(iii) of subsection 7 is expressly limited. He had already been granted entry to the United States as a business visitor. Second, even if the provision were applicable, the country

---

[6] The legal standard employed by the District Director and approved here today does not exclude from refugee status those who have fled from persecution and who make their flight in successive stages. Certainly many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way. Such stops do not necessarily mean that the refugee's aim to reach these shores has in any sense been abandoned. However, there are many refugees who have firmly resettled in other countries and who either never aimed to reach these shores or have long since abandoned that aim. In the words of the District Director, the presence of such persons in this country is not "one which is reasonably proximate to the flight" or is "remote in point of time or interrupted by intervening residence in a third country." Such persons are not entitled to refugee status under § 203 (a)(7).

In this very case, the District Court found that Yee Chien Woo was not firmly resettled even though he had lived in Hong Kong for six years after his initial flight. We do not express an opinion on that finding but merely remand the case to the Court of Appeals for review in accord with the proper legal standard.

"in which" respondent's application was made was the United States and he was certainly not a national of this country. Had he been a national he of course would have been entitled to remain here. Section 203 (a)(7)(A)(iii) applies only to applications for conditional entry into this country made to Immigration and Naturalization officers authorized to accept such applications at points outside the United States.

Because it was under the erroneous impression that resettlement was irrelevant to refugee status under § 203 (a)(7), the Court of Appeals failed to review the District Court's finding that respondent had never firmly resettled in Hong Kong. The District Director is, of course, entitled to review of that determination under the legal test set out in this opinion and the appropriate standards for judicial review. Consequently, the judgment below is reversed and the case is remanded to the Ninth Circuit for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

On March 8, 1966, the respondent, who fled mainland China for Hong Kong in 1953 and has resided in the United States since May 22, 1960, filed with the Immigration and Naturalization Service an application for adjustment of status pursuant to § 203 (a)(7) of the Immigration and Nationality Act, as amended, 8 U. S. C. § 1153 (a)(7) (1964 ed., Supp. V). By the terms of § 203 (a)(7) applicants for adjustment of status are required to show:

1. that they "have been continuously physically present in the United States for a period of at least two years prior to application for adjustment of status;"

2. that "because of persecution or fear of persecution

on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area . . . ;"

3. that they "are unable or unwilling to return to such country or area on account of race, religion, or political opinion;"

4. that they "are not nationals of the countries or areas in which their application for conditional entry is made . . . ."

The District Director denied the respondent's application for adjustment of status because of "intervening residence in a third country reasonably constituting a termination of the original flight in search of refuge." An administrative appeal was certified to the Regional Commissioner who held that § 203 (a)(7) does not apply "to aliens who although they had fled from their own country were later resettled in another country."

Section 203 (a)(7) contains no requirement that an applicant shall not have "resettled" prior to his application for conditional entry or adjustment of status. A requirement that an applicant shall not have "firmly resettled" did appear in an earlier version of the law but was eliminated by the 1957 amendments to the Refugee Relief Act of 1953. The requirement was not reintroduced in any of the subsequent enactments. To the contrary, cognizant House and Senate committees rejected a proposal of the Department of State that contained a requirement that a refugee alien must be one who "has not been firmly resettled . . . ." S. Rep. No. 1651, 86th Cong., 2d Sess., 19; H. R. Rep. No. 1433, 86th Cong., 2d Sess., 12. Senator Kennedy, who, as Chairman of the Subcommittee on Immigration and Naturalization of the Senate Judiciary Committee, presided over Senate hearings on the present § 203 (a)(7), stated that refugees "[a]s defined in this bill" "must be currently settled in countries other than their home-

lands." 111 Cong. Rec. 24227. This statement is flatly inconsistent with the proposition that the persons described in § 203 (a)(7) cannot have resettled in another country following their original flight.

In the face of the unambiguous language of § 203 (a) (7) and this clear legislative history, the Court today holds that a requirement of firm resettlement may properly be read back into the statute so as not to subvert what it considers to be the "central theme" of refugee legislation—"the creation of a haven for the world's homeless people." I have no doubt that in enacting refugee legislation Congress intended to provide a haven for the homeless. But the Court offers no reason to believe that Congress did not also intend to help those others who have fled their homeland because of oppression, have found a temporary refuge elsewhere, and now desire to immigrate to the United States. Congress may well have concluded that such people should be preferred to immigrants who have not suffered such hardship. The clear language of § 203 (a)(7) demonstrates to me that this was exactly what Congress intended to accomplish.

Whether the Attorney General has discretion concerning the order in which § 203 (a)(7) applications are processed is a different issue and one that is not before us. The Attorney General has not sought to invoke whatever discretion he may have to process the applications of the homeless before turning to those whose plight may be thought less pressing.[1] Indeed it appears

---

[1] Section 203 (c), 8 U. S. C. § 1153 (c) (1964 ed., Supp. V), which provides that visas shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General, does not by its terms apply to visas issued pursuant to § 203 (a)(7). And Senator Kennedy stated that under § 203 (a)(7) "the cases of greatest need can be processed at once." 111 Cong. Rec. 24227.

that in many years a number of the visas annually available for § 203 (a)(7) applicants have gone unused.[2]

The only issue before the Court is whether a refugee is totally barred from any consideration under § 203 (a)(7) by virtue of resettlement following flight. In view of the language of the statute and its legislative history, I cannot but conclude that under § 203 (a)(7) the respondent was eligible for the adjustment of status that he sought.

For these reasons I dissent.

---

[2] 1969 Annual Report, Immigration and Naturalization Service 38.