Samvel **ANDRIASIAN**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 97–70894.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1998.

Decided June 11, 1999.

---

Steven A. Hirsch, Keker & Van Nest, San Francisco, California, for petitioner.

Michelle Gluck, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent.

Before: FARRIS, REINHARDT, and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

Before 1988, Samvel Andriasian's family had lived relatively peacefully in Azerbaijan for seven generations. In 1988, however, a territorial dispute broke out between Azerbaijan and Armenia. The resultant inflammation of ethnic tensions and escalation of violence abruptly ended the Andriasian family's prospects for peaceful existence as ethnic Armenians living in Azerbaijan. Samvel Andriasian, his wife, and his daughters soon found themselves facing discrimination, hostility, harassment, and physical violence from their neighbors and coworkers wherever they went. The Azeris initiated an ethnic cleansing campaign that ultimately resulted in hundreds of thousands of individuals becoming refugees. Brutally attacked by their countrymen, the Andriasian family fled its homeland and ultimately arrived in Armenia. The Andriasians may have hoped that, since the Azeris had persecuted them for their Armenian origins, they would be more welcome in Armenia itself. But they soon made the unfortunate discovery that their new neighbors were also suspicious and hostile—because of the Andriasians' religion, their former residence in Azerbaijan, and their noticeable accents. In an effort to avoid further persecution, the family began a nomadic life, moving back and forth among three countries, the Ukraine, Russia, and Armenia.

After 44 months of moving from place to place seeking to avoid harassment, discrimination, and physical violence, Mr. Andriasian fled to the United States. However, the BIA exercised its discretion and denied him asylum, solely on the basis of the time that he spent in Armenia after his family had fled persecution in Azerbaijan. In doing so, the BIA committed a clear legal error by disregarding the INS regulation that governs the exercise of its discretion in such circumstances. Because the regulation precludes the BIA from denying Mr. Andriasian asylum on the basis it did, and because the BIA relied on no other ground in denying asylum, we hold that Mr. Andriasian is entitled to asylum in this country.

**BACKGROUND**

At his asylum hearing, on October 3, 1995, Mr. Andriasian testified that he, his wife Rima Diagarian–Andriasian, and his two daughters, Marine and Astghik, had lived peacefully in Baku, Azerbaijan until 1988.[1] Mr. Andriasian had worked as an engineer for the same employer, Baku Water Lines and Pipes, for over sixteen years, enjoying a relatively comfortable lifestyle, although he had always faced barriers to advancement as a result of his Armenian origins.

Far worse than simple discrimination was yet to come. In 1988, a dispute over the Azeri territory of Nagorno–Karabakh escalated ethnic tensions within Azerbaijan.[2] As a result, as Mr. Andriasian himself put it at the close of his asylum hear-

---

1. Azerbaijan was a part of the Soviet Union until 1991, when both Armenia and Azerbaijan gained their independence.

2. According to the 1992 State Department Country Report on Azerbaijan, the most recent conflict over the status of Nagorno–Karabakh commenced in 1988, when the region declared independence and Armenia declared its annexation of the province. The report estimates that pogroms and other tensions caused hundreds of thousands of ethnic Armenians to flee Azerbaijan and ethnic Azeris to flee Armenia. Thousands have died in the ensuing military conflict and accompanying violence.

ing, "everything was changed." In August 1989, two Azeri teenagers attacked and assaulted Mr. Andriasian's nine-year old daughter Marine, causing injuries which eventually resulted in the total loss of vision in her left eye. When Mr. Andriasian reported the assault, he recounted, the police " 'advised' me in a rather rude way to get out of Azerbaijan as soon as possible, if I wanted to save my life and the lives of my kids and wife." The day after he received this advice from the police, Mr. Andriasian was attacked by three young men near his workplace; they attempted to throw him into a water canal. His coworkers and employer began harassing him, eventually forcing him to resign his position. As did most of the few remaining ethnic Armenians left in the country, the Andriasian family began preparing to move.

Still, the Andriasian family had not yet experienced the worst of its suffering. On January 13, 1990, as Mr. Andriasian and his family prepared to leave Azerbaijan, an Armenian neighbor—the only other Armenian still living in the Andriasians' apartment building—knocked on their door in the middle of the night. Mr. Andriasian opened the door to find the neighbor bleeding from a gunshot wound. Before Mr. Andriasian could offer any assistance, five to six Azeri men rushed to the door, pushed the neighbor inside the apartment and shot him, killing him as the Andriasian family stood watching. The men then ransacked the Andriasians' apartment, stealing or destroying most of the personal belongings that they had packed in anticipation of their move, and brutally assaulted the entire family. The assailants beat Mr. Andriasian and held him down while the rest of his family was assaulted, knocked his daughter Marine unconscious, further damaging her left eye, and beat and sexually abused his wife Rima, causing her to also lose consciousness. As the attackers left, they issued a warning: the Andriasians must leave Azerbaijan within 24 hours or they would be killed. The family immediately fled to Moscow.

During the 44 months following their flight from Azerbaijan, the family's ordeal continued, causing them to move from place to place nine times. While in Moscow, the Andriasian family encountered difficulty finding housing and work because they lacked residency papers and faced discrimination as refugees from the Caucasus region. Marine obtained treatment for the damage to her eyes, but to no avail. Russian doctors diagnosed her as blind in her left eye and impaired in the other. In August 1990, the family left Moscow for Armenia, initially residing in the Armenian capital and then, as a result of the hostility they encountered there, constantly moving around between countries from August 1990 to September 1993, at which point they left for the Ukraine for the final time. After Mr. Andriasian made arrangements for his family, he returned to Armenia briefly in order to complete arrangements for obtaining his visa to visit the United States.

Because it is the Andriasians' stay in Armenia that is at issue in this case, the circumstances of their life in that nation merit further elaboration. The record on this subject is not fully developed. Mr. Andriasian was not represented by counsel and was not notified that he should be prepared to present evidence about the family's Armenian experience at his asylum hearing. However, the following facts were established on the record. Mr. Andriasian speaks Armenian with an accent and cannot read or write the language. His family's former residence in Azerbaijan and their resultant Azeri accents caused suspicion and hostility on the part of Armenians, who dubbed the Andriasians "traitors" and accused them of being true Azeris, not Armenians. After his neighbors discovered that Mrs. Andriasian had been sexually assaulted, they taunted her husband for being unable to prevent the attack, and one neighbor attempted to rape her. The Andriasian daughters were mocked by Armenian children; Marine's blindness made her a special target. The family members also faced harassment and

threats because of their Baptist religion, which differed from the majority Armenian Apostolism.[3] Mr. Andriasian testified that he was sometimes unable to go to church because Armenians would block his way. Because of the physical threats and harassment that the Andriasians faced, as well as at least one death threat, they moved frequently within Armenia, and never remained in the country for more than six months at a time, ultimately residing there for just 22 of the 44 months that preceded Mr. Andriasian's departure for the United States.[4] During the period that his family was in Armenia, Mr. Andriasian traveled frequently between Armenia and Russia, working as a trader. He also took his daughter Marine to Moscow for one final attempt to restore her eyesight, an attempt that ended in failure after her third operation.

Mr. Andriasian has submitted newspaper articles documenting that, at the time his family lived in Armenia, there were no procedures in place for refugees to apply for asylum or citizenship. Mr. Andriasian testified that he asked the government about temporary resident status and was told to "go to [Karabakh] to live with other Azerbaijanis." As previously noted, Nagorno Karabakh is a province of Azerbaijan that has a majority of residents of Armenian origin, the political status of which was the cause of the violence that the Andriasians fled.

Through the United States Consulate in Armenia, Mr. Andriasian applied for a visa to visit the United States. After being advised that the visa would be granted, he moved his family to the Ukraine in September 1993, and then returned to Armenia to obtain the document. Mr. Andriasian's wife and two daughters, now sixteen and seventeen years old, remain in the Ukraine today, awaiting resolution of his asylum case. They have recently been forced to move again within the Ukraine because of escalating hostility toward refugees from the Caucasus, as a result of the conflict with the Chechens.

## IMMIGRATION PROCEEDINGS

Mr. Andriasian entered the United States on December 25, 1993 as a temporary nonimmigrant visitor for pleasure, and failed to leave the country when his visa expired. He went to an INS office and requested the forms that would have allowed him to seek to extend his visa, but abandoned his efforts when he found that he could not fill out the forms by himself and was unable to afford an attorney. At a hearing held on June 1, 1995, the Immigration and Naturalization Service issued an Order to Show Cause initiating deportation proceedings. On September 22, 1995, Mr. Andriasian, representing himself, conceded deportability and requested asylum and withholding of deportation. He asked that Canada be designated as the country to which he would be deported if his asylum claim were denied. After ascertaining that Mr. Andriasian had neither lived in Canada nor applied for admission there (see 8 U.S.C. § 1231(b)(2)(B)), the Immigration Judge (IJ) asked that he designate an alternative, which Mr. Andriasian did—Australia; and the INS attorney, at the request of the IJ, designated Azerbaijan in the event that Australia refused Mr. Andriasian admission. The IJ then advised

3. The 1993 State Department Report on Armenia documents that Armenian law forbade proselytizing (which is a practice of the Andriasians' religion), allowed registration only of approved religions, restricted the freedoms of unregistered religions, and officially recognized Apostolism as the dominant denomination.

4. According to Mr. Andriasian's written submission to the BIA, the family resided in the following locations: Moscow from January 1990 to August 1990, Armenia from August 1990 through January 1991, the Ukraine from February to April 1991, Armenia from May through October 1991, Moscow from November 1991 to April 1992, Armenia from May through October 1992, Moscow from November 1992 to April 1993, Armenia from May 1993 through August 1993, and then the Ukraine commencing in September 1993. This information was not submitted to the IJ because Mr. Andriasian had no reason to know that it would be relevant. However, it is consistent with his testimony at the asylum hearing.

Mr. Andriasian to be prepared to submit evidence demonstrating that he should not be returned to Azerbaijan and continued the hearing.

Still not represented by counsel, Mr. Andriasian presented evidence as to why he should not be returned to Azerbaijan when the asylum hearing resumed on October 3, 1995.[5] However, before beginning her closing statement, the INS attorney asked that Armenia be added as an alternative country for deportation. The IJ did so. The IJ then issued his oral decision, denying asylum and withholding of deportation and ordering that Mr. Andriasian be deported to either Azerbaijan or Armenia. The IJ found Mr. Andriasian's testimony "on balance" credible, but denied relief primarily on the basis of his finding that Mr. Andriasian had "firmly resettled" in Armenia after fleeing Azerbaijan, rendering denial of asylum mandatory. The IJ found that, "[e]xcept for a brief reference on cross-examination to having problems with religious practice in Armenia during that time frame, the respondent did not assert any problems while living in Armenia between August 1990 and December 1993." He further found that the Armenian government had neither prevented Mr. Andriasian's resettlement nor imposed restrictions on the Andriasian family, and held that "the respondent is deemed to have firmly re-settled in Armenia, having remained there for a period of more than three years without difficulty and having only left that country for the United States of his own volition." As an alternative ground for denying asylum, the IJ concluded that Mr. Andriasian had not established that the "isolated events" of abuse experienced by his family, especially the final incident when the family was assaulted by five or six Azeri men, had a "direct nexus" with his nationality or ethnicity.

Mr. Andriasian appealed the IJ's decision. Unable to afford the $3000 fee requested by the attorney he had consulted, he continued to represent himself. In his submissions to the BIA, Mr. Andriasian complained that he had not been advised in advance of the possibility of deportation to Armenia; the BIA construed this complaint as a motion to remand in order to present additional evidence. In addition, Mr. Andriasian submitted a list detailing the timing of his family's series of moves after fleeing Azerbaijan and an article which corroborated his testimony that there were no established procedures for applying for citizenship in Armenia at the time that he lived there.

On July 8, 1997, the BIA granted Mr. Andriasian withholding of deportation to Azerbaijan on the ground that he had demonstrated persecution on the basis of his Armenian ethnicity. It also reversed the IJ's holding that Mr. Andriasian had firmly resettled in Armenia and that denial was therefore mandatory. The BIA noted that the circumstances did not qualify under the INS's own regulation defining firm resettlement, 8 C.F.R. § 208.15. Finally, it acknowledged that Mr. Andriasian had demonstrated *eligibility* for asylum and that, if returned to Armenia, he "may likely face further discrimination and harassment on account of his Baptist faith and inability to speak Armenian."

▇ Nonetheless, the BIA exercised its discretion to deny asylum to Mr. Andriasian solely on the ground that subsequent to his persecution in Azerbaijan he had "spent a considerable amount of time" in Armenia. Despite its citation to the proper regulatory authority governing consideration of firm resettlement as a *mandatory* ground for denial of asylum, the BIA did not even acknowledge the regulation governing *discretionary* consideration of

---

5. In addition to his own testimony, Mr. Andriasian presented two other witnesses, his former elementary school teacher (who verified his Armenian ancestry) and his current pastor. The IJ and the INS attorney both asked the pastor about Mr. Andriasian's religion and the persecution faced by Protestants in Arme-

nia. Mr. Andriasian also submitted documentation of his daughter's eye injury, State Department Country Reports, and a number of newspaper articles (some of which discussed the conflict between Azerbaijan and Armenia and government discrimination against evangelical faiths in Armenia).

the opportunity for resettlement in a third country, 8 C.F.R. § 208.13(d). Instead it relied exclusively upon a BIA decision that predated the applicable regulation. The BIA found that Mr. Andriasian had resided in Armenia for over three years, leaving only to find work and to obtain medical treatment for his daughter.[6] On the basis of the State Department Country Reports for Armenia,[7] it found that "orderly refugee procedures were available" in that country.[8] It then concluded, "[t]he respondent, as an ethnic Armenian has not established that he will face persecution in Armenia. Consequently, the respondent's application for asylum will be denied in the exercise of discretion."[9]

Mr. Andriasian filed a notice of appeal, and this Court appointed pro bono counsel to represent him.[10]

## STANDARD OF REVIEW

■■■ Because the BIA conducted a de novo review, we limit our review to its decision except insofar as it adopted the IJ's reasoning. *See Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir.1998). Factual determinations of the BIA are reviewed under the substantial evidence standard, and are upheld "unless the evidence com-

pels a contrary conclusion." *Meza–Manay v. INS*, 139 F.3d 759, 762 (9th Cir.1998). While the BIA's determination that an individual is not eligible for asylum or withholding of deportation is reviewed under this substantial evidence standard, *see Singh v. INS*, 134 F.3d 962, 966 (9th Cir. 1998); *Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998), its discretionary decision to deny asylum is reviewed for abuse of discretion. *See Lopez–Galarza v. INS*, 99 F.3d 954, 960 (9th Cir.1996). The BIA must exercise its discretion "within the constraints of law," *Singh v. INS*, 94 F.3d 1353, 1358 (9th Cir.1996), and abuses its discretion if its decision is "arbitrary, irrational, or contrary to law." *Lopez–Galarza*, 99 F.3d at 960 (internal quotation omitted). Claims of due process violations in immigration proceedings are reviewed de novo. *See Sharma v. INS*, 89 F.3d 545, 547 (9th Cir.1996).

## DISCUSSION

### I.

### Summary

■■■ Once an asylum applicant has demonstrated eligibility for asylum, the decision whether to grant that relief is as-

---

6. In so finding, the BIA did not dispute Mr. Andriasian's testimony and written submissions that his family had moved nine times during that three year period and had spent only 22 of 44 months in Armenia; nor did it find that the evidence was not credible. It simply ignored it.

7. While Mr. Andriasian submitted the 1993 State Department Country Report for Armenia, the BIA also appeared to rely upon more recent Country Reports that were not included in the record in reaching its conclusions. This was impermissible. The BIA may not take administrative notice of a change in country conditions without providing an asylum applicant with the opportunity to rebut such evidence. *See Gonzalez v. INS*, 82 F.3d 903, 912 (9th Cir.1996).

8. It did not discuss Mr. Andriasian's testimony or corroborative article regarding the absence of orderly refugee procedures, nor Mr. Andriasian's testimony that authorities had told him to "go to [Karabakh]" when he had asked about obtaining refugee status.

9. In reaching this conclusion, the BIA again appeared to rely primarily on evidence outside the record indicating that Armenia was moving in a democratic direction and was increasing its religious tolerance. It also apparently disregarded the evidence that Mr. Andriasian had submitted demonstrating officially sanctioned religious discrimination as well as Mr. Andriasian's testimony that he had been unable to obtain work and had faced religious harassment and other threats. Finally, the BIA rejected Mr. Andriasian's due process objection to the lack of notice that he could be deported to Armenia and his contention that he still had a right to present evidence regarding conditions in that country, apparently under the mistaken belief that he was complaining about a change in IJ's.

10. Pro bono counsel Steven A. Hirsch of the firm of Keker & Van Nest did an excellent job of clarifying the factual and legal issues both in his briefs and at oral argument, for which this court is grateful.

signed by statute to the discretion of the Attorney General.[11] 8 U.S.C. § 1158(b)(1) (1998). This grant of discretion, while a "broad delegation of power," *Yang v. INS*, 79 F.3d 932, 935 (9th Cir.1996) (quoting *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir.1994)), is subject to "the constraints of the law." *Singh v. Ilchert*, 69 F.3d 375, 380 (9th Cir.1995). It is the BIA's failure to acknowledge and comply with the constraints established by its own regulation that is primarily at issue in the instant case.

 The petitioner argues in the alternative, and each argument suggests a different form of relief. First, he asserts that the last minute designation of Armenia as a country of deportation violated due process and that he is entitled to a remand in order to present additional evidence of the persecution that he would face if deported to that country.[12] On this point, the INS has advised us that it is now in agreement with Mr. Andriasian. It is of course wholly impermissible to base a denial of asylum on an applicant's inadequate presentation of evidence on a matter that he had no reason to anticipate would be a subject of the asylum hearing. Mr. Andriasian was operating under the belief—a belief based on instructions on the INS forms as well as the instructions from the IJ at the initial hearing—that he needed to present evidence only in support of

his claim for asylum and withholding of deportation to Azerbaijan. He was not informed otherwise until the end of his asylum hearing, after the close of evidence. This violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence. *See Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999) (reliance on adverse credibility finding without giving petitioner notice of inconsistencies and opportunity to explain violates due process); *Castillo–Villagra v. INS*, 972 F.2d 1017, 1029 (9th Cir.1992) (taking administrative notice of changed country conditions without providing opportunity to rebut violates due process). Failing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process. *See Kossov v. INS*, 132 F.3d 405, 408–09 (7th Cir.1998) (designation of country of deportation at beginning of asylum hearing is insufficient notice to unrepresented applicants); 8 C.F.R. § 240.49(c)(2) (1999) (requiring that IJ provide notification of right to apply for asylum or for withholding of deportation to country of deportation and forms for such application).[13]

---

11. INS regulations have delegated this discretion to IJs, whose decisions are subject to review by the BIA. *See Kazlauskas v. INS*, 46 F.3d 902, 906 n. 2 (9th Cir.1995).

12. The BIA also correctly held that the IJ erred by failing to honor Mr. Andriasian's designation of Australia and substituting Armenia as the country to which he would be deported. "Under 8 U.S.C. § 1253(a), an alien has a right to designate a country of deportation. We have characterized this right as a substantive right and have found that failure to afford an alien this right constitutes reversible error." *Bui v. INS*, 76 F.3d 268, 270 (9th Cir.1996). Although the INS would have been free to disregard this designation if Australia were to refuse to accept Mr. Andriasian or to fail to respond to the INS inquiry within the time period prescribed by law, it lacked the authority to simply ig-

nore Mr. Andriasian's choice. *See* 8 U.S.C. § 1253(a) (1995); 8 U.S.C. § 1231(b)(2) (1999). Even when it is unlikely that the designated country of deportation would accept an individual, "an IJ may not rely upon a prediction of which country may or may not accept the alien. That decision lies with the designated country; INS officials may not cut off an alien's opportunity to have the designated country take action on the application." *Bui*, 76 F.3d at 270. This error is no longer relevant, however, in light of our holding that Mr. Andriasian is entitled to asylum in the United States.

13. Had Mr. Andriasian been notified at the beginning of his asylum hearing, this still would not have provided sufficient notice, especially given his pro se status. *See Kossov*, 132 F.3d at 408–09.

■ Mr. Andriasian's second argument, however, is the one that is dispositive here. He points out that in this case there is no need to provide him with an opportunity to submit further information regarding conditions in Armenia, because proof that he may not be returned to that country would be pertinent only if the BIA's discretionary denial of his asylum claim were lawful, and it was not. He is correct. After reviewing the record, the relevant case law, and the INS regulations that govern stays in third countries prior to arrival in the United States, we conclude that the denial of Mr. Andriasian's asylum petition was contrary to law and constituted an abuse of discretion. Mr. Andriasian was neither firmly resettled nor offered resettlement in Armenia; in fact, he was harassed and threatened while there, and told to return to Azerbaijan. Under these circumstances, the INS regulations do not permit the BIA to deny his asylum request on the ground of his temporary stay in that country. Because the BIA found Mr. Andriasian eligible for asylum and because no other ground for denial of discretionary relief was cited by the BIA (or appears in the record) we remand for a grant of asylum.[14]

## II.

### Analysis

■ As the BIA held, Mr. Andriasian has demonstrated that he faced persecution in Azerbaijan based on his Armenian ethnic origin.[15] The beatings that he and his family members endured indisputably qualify as "persecution." "There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the Act." *Singh*, 94 F.3d at 1360. In fact, the warning that the Andriasians would be killed if they did not leave Azerbaijan immediately—which was made all the more credible by the fact that the Azeri thugs who issued the threat had just murdered Mr. Andriasian's neighbor in cold blood—would by itself be sufficient to establish past persecution. *See Gonzalez*, 82 F.3d at 909; *Aguilera–Cota v. INS*, 914 F.2d 1375, 1383 (9th Cir.1990). While the acts of persecution were not perpetrated directly by government officials, the widespread nature of the persecution of ethnic Armenians documented by the State Department Country Report, combined with the police officer's response when Mr. Andriasian turned to him for help, clearly establishes that the government of Azerbaijan either could not or would not control

14. The INS's contention that Mr. Andriasian was required to demonstrate eligibility for asylum not only from Azerbaijan but also from his designated country of deportation is based on a misunderstanding of the meaning of asylum and an erroneous reading of the applicable regulations. The regulations protect applicants who may be found deportable but have not previously filed applications for asylum or withholding of deportation by providing them with a clear opportunity to request asylum and/or to oppose a potential deportation order on the ground that they fear persecution in a particular country to which they might be deported. *See 8* C.F.R. §§ 240.11(c)(1), 240.33(a), 240.49(c)(2) (1999). If a petitioner is granted asylum, then the persecution that he would face if returned to a designated country of deportation is no longer relevant—because he may not be deported to that country or to any other. Because we hold that Mr. Andriasian is entitled to asylum, the regulatory provisions cited by the INS are inapplicable, and he need not demonstrate that he is also entitled to "asylum from Armenia."

15. Under asylum law, persecution on the ground of ethnic origin is treated as persecution on the ground of race, and therefore qualifies as a form of persecution that establishes eligibility for asylum. *See Singh*, 94 F.3d at 1360 (analyzing persecution of Indo–Fijians as persecution on account of race). It can also be characterized as persecution on the ground of nationality. *See* United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status, at 18, ¶¶ 68 & 74 (Geneva, 1979) (defining race as "frequently ... entail[ing] membership of a specific social group of common descent forming a minority within a larger population" and nationality as "membership of an ethnic or linguistic group," and noting that the two terms may sometimes overlap).

Azeris who sought to threaten and harm ethnic Armenians living in their country. *See Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997) ("'Persecution' may be inflicted either by the government or by persons or organizations which the government is unable or unwilling to control."). Such a demonstration of past persecution entitles Mr. Andriasian to a presumption of a likelihood of future persecution. *See Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996); 8 C.F.R. § 208.13(b)(1)(i) (1999). Similarly, because Mr. Andriasian has demonstrated that his life was threatened because of his Armenian ancestry, it is presumed that he is entitled to withholding of deportation. *See Surita v. INS*, 95 F.3d 814, 821 (9th Cir.1996); 8 C.F.R. § 208.16(b)(2) (1999). The INS does not now challenge, and we accordingly affirm, the BIA's conclusion that Mr. Andriasian made a sufficient showing that he would face persecution if he were returned to Azerbaijan to warrant both withholding of deportation and eligibility for asylum.

■■■ The INS also does not challenge, and we therefore also affirm, the BIA's conclusion that Mr. Andriasian's circumstances did not meet the definition of "firm resettlement" under the INS regulation that *mandates* a denial of asylum if a third country in which an alien has resided after becoming a refugee offers him permanent resettlement; such "resettlement" precludes asylum, unless the applicant can demonstrate that his stay in the third country lasted only until he could arrange for further travel or that the conditions of life in that country would be unduly restrictive. *See* 8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15 (1999).[16] In the absence of direct evidence of an offer, a lengthy, undisturbed residence in a third country may establish a rebuttable presumption that an individual has the right to return to that country and remain there permanently. *See Cheo v. INS*, 162 F.3d 1227, 1229–30 (9th Cir.1998) (three year

undisturbed stay in Malaysia shifted burden to petitioners to demonstrate that they had not firmly resettled there).

Although the BIA did not articulate its reason for holding that Mr. Andriasian's circumstances failed to meet the regulation's definition of firm resettlement, its conclusion is in accord with the law and is supported by substantial evidence. There is no evidence in the record that Mr. Andriasian was offered resettlement by Armenia—quite the opposite; he was told to go back to Azerbaijan. The *Cheo* presumption is also inapplicable, because the Andriasian family's stay in Armenia can in no way accurately be characterized as "undisturbed;" to the contrary, it was disrupted by harassment, discrimination, and threats to personal safety, and at times by the need to flee such treatment. Here, unlike in *Cheo*, the duration and circumstances of the stay do not indicate that the Andriasians were offered a "permanent refuge," as was made clear by the hostile response by Armenian government officials to their request for temporary resident status. Thus, no presumption of firm resettlement arises.

■■ While the BIA correctly concluded that mandatory denial of asylum would be impermissible under the applicable INS regulation, it also determined that Mr. Andriasian was not entitled to a favorable exercise of discretion because of the time that he had spent in Armenia. In reaching this conclusion, the BIA neither mentioned nor discussed the regulation that governs the exercise of its discretion in cases such as Mr. Andriasian's. Instead, it erroneously relied on *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (BIA 1987), which outlined a number of factors that may appropriately be considered in making discretionary determinations. However, *Matter of Pula* was decided before the adoption of the regulations which now control both mandatory and discretionary denials of asylum on the basis of a petitioner's stay

---

**16.** In 1996, Congress codified this restriction on eligibility for resettlement. 8 U.S.C. § 1158(b)(2)(A)(vi) (1996).

or opportunity to stay in a third country. *See* 59 Fed.Reg. 62,284–01, 62,301 (1994) (codified at 8 C.F.R. § 208.14(e) (1995)); 62 Fed.Reg. 10,312, 10,342 (1997) (codified at 8 C.F.R. § 208.13(d) (1998)).[17] *Matter of Pula* was the BIA's "attempt to fill a gap left in INS regulations," *Yang v. INS*, 79 F.3d 932, 936 n. 6 (9th Cir.1996), a gap that has now been filled by the subsequent action of the INS.[18]

The amended regulations now specify how and when an opportunity to stay in a third country justifies a mandatory or discretionary denial of asylum by an IJ or the BIA (hereinafter for convenience referred to collectively as "the BIA"). In both instances the BIA is compelled to evaluate the conditions that the individual would face if he were to be returned to that third country. The primary distinction between the two provisions is that denial of asylum is mandatory only if an alien has already firmly resettled in the third country, while in making its discretionary decision the BIA may in some instances consider the fact that a petitioner has enjoyed a brief stay in another country—or even that another country has offered him resettlement despite his never having stayed there at all. The amended regulation governing discretionary denials provides:

> An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

8 C.F.R. § 208.13(d) (1999).[19]

**17.** At the time that *Matter of Pula* was decided, the regulations provided that INS district directors were required to deny asylum upon a finding of firm resettlement and could consider, in their exercise of discretion, the existence of an offer of resettlement from a third country in which the individual would not face persecution. *See* 8 C.F.R. §§ 208.8(f)(1), 208.8(f)(2) (1987). However, the BIA interpreted these regulations as applicable only to district directors, and construed them as not confining its own exercise of discretion or that of the IJs. *See Matter of Soleimani*, 20 I. & N. Dec. 99, 104 (BIA 1989) (regulation barring district director from granting asylum to firmly resettled alien did not similarly constrain BIA or IJs); *Matter of Salim*, 18 I. & N. Dec. 311, 315 (BIA 1982) (§ 208.8 does not bind BIA's exercise of discretion, but provides useful guidance). *See also Farbakhsh v. INS*, 20 F.3d 877, 881 (8th Cir.1994) (BIA did not view § 208.8 as constraining IJs or BIA); *Duran v. INS*, 756 F.2d 1338, 1340 n. 1 (9th Cir.1985) (characterizing § 208.8 as "rules governing the district director's decision"); *Carvajal–Munoz v. INS*, 743 F.2d 562, 565–66 (7th Cir.1984) (noting that § 208.8 did not provide for how an IJ should make decisions and is used by BIA only as guideline). *Matter of Pula* was thus decided in the absence of any regulatory constraints upon the IJs' or the BIA's discretion to consider an asylum applicant's stay in a third country. In 1990, however, the regulations were amended to delegate the authority of district directors to adjudicate asylum applications to asylum officers, and § 208.8 was eliminated. 55 Fed. Reg. 30,683, 30,680, 30,682 (1990). In that same year, 8 C.F.R. § 208.14 was adopted; it made firm resettlement a mandatory ground for denial of asylum. Until 1994, however, no regulation discussed how an offer of resettlement from a third country should affect the IJ's or BIA's exercise of discretion. *See* 8 C.F.R. § 208.14(c)(2) (1991); 55 Fed.Reg. 30,674, 30,678 (1990).

**18.** In any event, the BIA's reading of *Matter of Pula* was probably erroneous. The *Pula* factors were to be considered only when an adverse factor, such as an applicant's prior criminal history or his use of immigration fraud to enter the country, was present and might, given all the circumstances, overcome the presumption that "the danger of persecution should generally outweigh all but the most egregious of adverse factors.... In the absence of any adverse factors ... asylum should be granted in the exercise of discretion." *Matter of Pula*, 19 I. & N. Dec. at 474. The effect of the *Pula* decision was to limit a previous BIA opinion, *Matter of Salim*, 18 I. & N. Dec. 311 (BIA 1982), which had suggested that a refugee's circumvention of legal immigration procedures would by itself warrant discretionary denial of asylum in most cases. *Matter of Pula*, 19 I. & N. Dec. at 472–73. *See also Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir.1995) (holding consideration of *Pula* factors proper in case in which asylum applicant had prior criminal convictions). This court has never in a published decision allowed discretionary consideration of time spent in a third country when no egregious or independent adverse factors were present.

**19.** The quoted version of the regulation went into effect on April 1, 1997. 62 Fed.Reg. 10,312 (1997). The 1994 version of the regu-

Two independent reasons preclude the use of Mr. Andriasian's temporary stay in Armenia as a basis for discretionary denial of asylum under the regulation. First, the INS now concedes that Mr. Andriasian "was not offered resettlement by Armenia within the meaning of 8 C.F.R. § 208.13(d) (1998)." This admission was probably required by the absence of any evidence in the record that Mr. Andriasian ever received an offer of resettlement from Armenia. The response that he received to his inquiry about temporary resident status ("go to [Karabakh] to live with other Azerbaijanis"), which the INS initially relied on as evidence of such an offer, was in fact not an offer at all, but was instead equivalent to Mr. Andriasian's being told to go back where he came from.[20] Furthermore, as discussed earlier, the circumstances here do not invoke the presumption of resettlement that is triggered by extended, undisturbed residence.[21] In any event, the INS's concession that no resettlement offer was made precludes a discretionary

denial of asylum on the basis of the time Mr. Andriasian spent in Armenia.

Second, the regulation permits a discretionary denial of asylum only if the petitioner "would not face harm or persecution" in the third country. By mentioning both harm *and* persecution and employing the conjunctive "or," the regulation makes it clear that Mr. Andriasian need not demonstrate the likelihood of persecution, and that a lesser form of threatened injury is enough. Under the regulation, asylum may not be denied to the petitioner unless the INS demonstrates that he *would not* be subject to harm if deported to the third country. In Mr. Andriasian's case, the BIA made a specific finding of such potential harm. It found that "evidence of record supports the contention that the respondent may likely face further discrimination and harassment" if he returned to Armenia. While it concluded later in its opinion that this treatment would not rise to the level of persecution, the BIA's finding is nonetheless clearly

lation, which was in effect at the time of Mr. Andriasian's original asylum hearing, outlined different requirements:

> An application from an alien may be denied in the discretion of the Attorney General if the alien can and will be deported or returned to a country through which the alien traveled en route to the United States and in which the alien would not face harm or persecution and would have access to a full and fair procedure for determining his or her asylum claim in accordance with a bilateral or multilateral agreement with the United States governing such matter.

208 C.F.R. § 208.14(e) (1994). The parties have argued the case under the current version of the regulation. Under either version, Mr. Andriasian's stay in Armenia does not meet the regulation's requirements. With respect to the former regulation, there is no evidence in the record that the United States had an agreement with Armenia governing asylum procedures; in fact, at the time the 1994 regulation went into effect the United States had no such agreement with any country and the government acknowledged that the regulation would, accordingly, not be implemented. 59 Fed.Reg. 62,284, 62,296 (1994).

20. The meaning of this statement was disputed by the parties at oral argument; the INS argued that the territory was located within

Armenia and that the statement was an offer of resettlement, while Mr. Andriasian claimed that the territory was part of Azerbaijan. Subsequently, in a written submission to this court, the INS conceded that Karabakh is in fact a province of Azerbaijan.

21. In its brief, the INS had also pointed to testimony by Mr. Andriasian that indicated that he had decided not to apply for refugee status in Armenia because he thought it would have prevented him from going to the United States. In oral argument, however, it conceded that this failure to take affirmative steps to apply for permanent status in a third country would not justify denial of asylum. *See Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986) (concluding that failure to seek asylum in other unstable countries in same region as country of origin was reasonable). Rather, in the absence of a showing of a lengthy undisturbed residence, it was the INS's burden to show that Armenia had made an offer or at least that such permanent status was available to Mr. Andriasian. Moreover, Mr. Andriasian has presented evidence that Armenia had no procedures for application for asylum or citizenship at the time he resided there and that any application would have therefore been fruitless.

sufficient to preclude a determination that petitioner "would not face harm." Thus, for that reason as well, the BIA may not, under the applicable regulation, consider Mr. Andriasian's temporary stay in Armenia as a basis for a discretionary denial of his asylum claim.

Thus, under the regulation governing discretionary denials, an application may not be denied because a petitioner spent some time in a third country after fleeing from the country from which he seeks asylum, *unless* resettlement has been offered and the alien would not face harm or persecution if returned to the third country. That the regulation is intended to apply primarily to persons, like Mr. Andriasian, who spent periods of time in third countries after fleeing their native land is clear from the fact that it is not uncommon for such countries to offer refugees, or at least some of them, the opportunity to remain permanently, while third countries through which refugees have *not* passed rarely if ever offer them resettlement. In light of the findings in the BIA's decision regarding the discrimination and harassment he would likely face if returned to Armenia and in light of the INS's written admissions after oral argument that he was not offered resettlement in that country, the regulation clearly does not permit the denial of asylum to Mr. Andriasian.

In denying Mr. Andriasian's request for asylum, however, the BIA did not determine that the regulation permitted denial of asylum; rather, it failed even to consider or apply the regulation governing discretionary denials on account of a petitioner's opportunity to reside elsewhere. It is the failure to abide by its own regulations that renders the BIA's decision "contrary to law," *Lopez–Galarza*, 99 F.3d at 960 (quoting *Padilla–Agustin v. INS*, 21 F.3d 970, 973 (9th Cir.1994)), and therefore an abuse of discretion. For while, in the absence of any regulatory guide, the BIA's authority to consider various factors in

exercising its discretion would be relatively unconstrained, "[i]t is a well-known maxim that agencies must comply with their own regulations." *Ramon–Sepulveda v. INS,* 743 F.2d 1307, 1310 (9th Cir.1984).[22] In this regard, we note that we are not contesting the INS's interpretation of the governing statute. *Cf. INS v. Aguirre–Aguirre,* —— U.S. ——, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Rather, our decision is based on its failure to apply its own construction of the statute as embodied in the applicable regulations.

The INS asserts one final argument. It argues that, even if the regulation governing discretionary denials does not authorize consideration of Mr. Andriasian's temporary stay in Armenia as a ground for denial, it does not limit the BIA's right to exercise its discretion to deny asylum applications for any reason it chooses, including the limited amount of time Mr. Andriasian spent in that country. We reject this argument. The interpretation of the regulation that the INS suggests—that the BIA may use the fact that the petitioner has stayed for a temporary period in a third country to deny him asylum, even though under the regulation he may not be deported to that country—would significantly undermine the purpose and effect of the regulations regarding resettlement. Together, the mandatory and discretionary regulations set forth the minimum conditions under which a petitioner may be denied asylum because he has an opportunity to reside permanently in a third country. Under the regulations, the circumstances must show that he has established, or will be able to establish, residence in another nation, and that he will have a reasonable assurance that he will not suffer further harm or persecution there. The purpose of these regulations is to ensure that if this country denies a refugee asylum, the refugee will not be forced to return to a land where he would once

---

**22.** At oral argument, the INS conceded that 8 C.F.R. § 208.13(d) constrained the Attorney General's exercise of discretion. *See also Yang,* 79 F.3d at 937 (discussing effect of regulations on conferral of discretion in asylum cases); *Bui,* 76 F.3d at 270 ("The INS must follow its own regulations.").

again become a victim of harm or persecution. The INS's argument that it has the discretionary authority to deny asylum when a refugee has spent a brief period of time in a third country but has no opportunity to return there or, if he does, would be subject to further serious harm, would permit just such a result and would totally undermine the humanitarian policy underlying the regulation. That a refugee has spent some period of time elsewhere before seeking asylum in this country is relevant only if he can return to that other country. Otherwise, that fact can in no way, consistent with the statute and the regulations, warrant denial of asylum. Because, as we have noted earlier, Mr. Andriasian's temporary stay in Armenia was the sole basis for the denial of his petition for asylum (and no other basis appears in the record) we hold that the BIA abused its discretion and that the discretionary denial of relief was contrary to law.

REVERSED and REMANDED with instructions that the petition for asylum be granted.