**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VINODH PARSAD MAHARAJ; SUNITA
DEVI MAHARAJ; PREETIKA MAHARAJ;
MEENAL MAHARAJ; VINEET
MAHARAJ,

*Petitioners,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 03-71066

Agency Nos.
A71-788-923
A71-788-924
A72-402-323
A72-402-324
A72-402-325

VINODH PARSAD MAHARAJ; SUNITA
DEVI MAHARAJ; PREETIKA MAHARAJ;
MEENAL MAHARAJ; VINEET
MAHARAJ,

*Petitioners,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 03-73995

Agency Nos.
A71-788-923
A71-788-924
A72-402-323
A72-402-324
A72-402-325

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 12, 2005—San Francisco, California

Filed August 4, 2005

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Andrew J. Kleinfeld, Circuit Judges.

10067

Opinion by Judge O'Scannlain

**COUNSEL**

Ashwani K. Bhakhri, Law Offices of Ashwani K. Bhakhri, Burlingame, California, argued the cause for the petitioner, and filed a brief.

James E. Grimes, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., argued the cause for the respondent. Peter D. Keisler, Assistant Attorney General, Richard E. Evans, Assistant Director, and Nancy E. Friedman, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., were on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a Fijian citizen's four-year residence in Canada, which ended when he entered the United States, constituted "firm resettlement" under federal immigration law, thus barring his claim for asylum here.

I

Vinodh Maharaj, his wife, and two of their three children are citizens of Fiji,[1] where they lived until November, 1987. In March, 1987, Maharaj, who worked as a bus driver, was instructed by his boss to help the Coalition Labor Party (CLP) mobilize voters for the upcoming national election. His election-related work involved transporting Indo-Fijian voters to and from the polls in a bus festooned with CLP placards, posters and flags. Although Mr. and Mrs. Maharaj were not affiliated with any political party, they believe that ideological support for the CLP party was imputed to them because of his busing of voters and her non-partisan work at a polling station located at the school where she worked as a secretary. This is quite likely given the close identification of race and politics in Fiji. In the 1987 election, native Fijians, who make up 51% of the population, voted overwhelmingly for native Fijian par-

---

[1] Maharaj is the principal petitioner for asylum; his wife's petition, and those of his three children, are derivative of his petition. The third child was born in, and is a citizen of, Canada.

ties, and Indo-Fijians like the Maharajs, who make up 44% of the population, voted overwhelmingly for the CLP and other Indo-Fijian parties. After the election, which the CLP won, Mr. Maharaj received several threats from native Fijians, who blamed his busing for helping the CLP to gain power and threatened to kill him and his family and to burn down his house.

Two months later, the Fijian army, which is almost exclusively native Fijian, overthrew the newly elected CLP government. In the immediate wake of the coup, the Maharaj family's rented room was invaded by two soldiers, who stole various items, tied Maharaj up and forced his wife to conduct traffic in her underwear at gunpoint. Shortly after this incident, Mrs. Maharaj was assaulted by two soldiers on her way to work. They forced her into an empty house and raped her, breaking her right arm and burning her with cigarettes. When she went to the police and to the hospital, she was turned away and told that their services were only for native Fijians.

In June or July, Maharaj was attacked on his bus route by native Fijians. They demanded money from him and, when he refused, they broke two of his ribs, knocked him unconscious, and left him with a seriously bruised jaw and cuts on his face. Although he was able to receive medical attention in a hospital, when he went to the police they turned him away because he was Indo-Fijian.

The next month, in August, the family's rented room was burned down and Mrs. Maharaj was burned, though not seriously, in the fire. There were no witnesses, but Mr. Maharaj believes that the fire was set by native Fijians.

Although no further attacks occurred after August, Mr. Maharaj continued to receive general threats and harassment at work from native Fijians, and he was hindered in his practice of Hindu worship. In November, the family left Fiji for Canada and settled in Edmonton, where Mr. Maharaj has

some distant family. In Canada, they applied for permanent residence as refugees.

Mr. Maharaj worked in Edmonton as a full-time janitor and also as a bakery deliveryman while his wife received training to become a nurse's assistant and worked full-time for a year caring for the elderly. Both Mr. and Mrs. Maharaj were given Social Insurance Numbers and work authorization, their third child was born in Edmonton, their children attended free public school and the family received free health care from the Canadian government. Although Mr. and Mrs. Maharaj complained about working menial jobs that they did not enjoy, and about stigma associated with being refugees, they were able to worship freely at a Hindu temple and had non-Indian and non-Fijian friends in Edmonton. The Immigration Judge (the "IJ") found that there is no question that they were free from persecution in Canada.

After four years in Canada, the Maharaj family entered the United States in March, 1991, at the border crossing between Vancouver, Canada, and Blaine, Washington, in a vehicle driven by a Canadian citizen. Both Mr. and Mrs. Maharaj later testified about their reasons for leaving Canada for the United States. Mr. Maharaj testified that he "wanted to move to United States because, uh, [he] wanted to see what United States looks like" and that the "main thing was job. We never had a good job." Mrs. Maharaj testified that "we were not getting good job . . . . We wanted to, you know, go up and have more money and build ourself. So, that's the time when we thought we don't like Canada." When they arrived, they "liked this place much better than Canada, so [they] decided to stay here."

After the family overstayed its permitted time in the United States,[2] Mr. and Mrs. Maharaj were served with Orders to

---

[2]Despite their lack of identification papers, the U.S. border guard appears to have negligently assumed that all the passengers in the vehicle were Canadian citizens, and they were admitted as visitors with leave to remain for six months.

Show Cause by the INS charging them and their children as deportable. At their hearing, the family conceded deportability but Maharaj requested asylum and withholding of removal. The IJ denied Maharaj's request because he and his family had been firmly resettled in Canada and he was, therefore, ineligible for asylum. The IJ also denied him withholding of removal because, although he had endured past persecution, the IJ held that, because circumstances in Fiji had changed since his departure in 1987, there is no clear probability that Maharaj's life or freedom would be in danger upon his return. The IJ designated Fiji as the country of removal for the family, with the exception of the youngest child, who is a Canadian citizen by birth, whose country of removal was designated as Canada.

Before his appeal had been heard by the Board of Immigration Appeals (the "BIA"), Maharaj filed a motion to reopen the case (not with the Immigration Court, but with the BIA) based on new evidence of conditions in Fiji and also submitted a one-page fax purporting to show that his Canadian asylum application had been denied. In due course, the BIA affirmed the IJ's decision in a written opinion. It agreed that Maharaj was ineligible for asylum because his family had been firmly resettled in Canada, and, in the alternative, it held that the presumption of a well-founded fear of persecution had been rebutted by evidence of changed circumstances in Fiji. It also affirmed the IJ's decision to deny withholding of removal. Maharaj's motion to reopen, together with the fax, was treated by the BIA as a motion to supplement the record and was denied.

Maharaj again petitioned the BIA to reopen his case, based on the coup that had occurred in Fiji in May, 2000, which had also been the basis for his first motion to reopen. The BIA issued a second opinion, which held that the evidence of changed conditions in Fiji had already been considered and rejected and did not warrant reopening the case.

Maharaj timely appeals the BIA decision affirming the IJ's original decisions to deny him asylum and withholding of removal. He has not challenged the BIA's denial of his motion to reopen and thus that claim has been waived. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996).

II

**[1]** The plain language of the firm resettlement regulation[3] requires that a petitioner be denied asylum if he has been "firmly resettled" in a third country prior to entering the United States. *See* 8 C.F.R. § 208.13(c)(2)(i)(B) (1999); *see also Andriasian v. INS*, 180 F.3d 1033, 1043 (9th Cir. 1999). "Firmly resettled" means that, "prior to arriving in the United States, [the petitioner] entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15.[4] Despite this language, this court

---

[3]Because Maharaj filed his application for asylum on May 3, 1991, before the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, his case must be reviewed under the firm resettlement provision set out in 8 C.F.R. § 208.13(c)(2)(i)(B). *See Ali v. Ashcroft*, 394 F.3d 780, 789 n.9 (9th Cir. 2005) ("*Deqa Ali*").

[4]In 1996, the firm resettlement bar to asylum was codified at 8 U.S.C. § 1158(b)(2)(A)(vi), but the definition at 8 C.F.R. § 208.15 remained the same. Even when this provision applies, there are two exceptions under which a petitioner may rebut a prima facie showing of firm resettlement. These exceptions are:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immi-

has consistently held that, in the absence of evidence of such offer, a petitioner's extended, undisturbed residence in a third country creates a presumption of firm resettlement that will satisfy the definition. *See Cheo v. INS*, 162 F.3d 1227, 1229 (9th Cir. 1998); *see also Andriasian*, 180 F.3d at 1043.

This "*Cheo*" presumption is a useful complement to the plain language of the firm resettlement regulation. In this context, there is an incentive on the part of the petitioner to conceal evidence of an offer of permanent resettlement in a third country because producing it would defeat his claim. It is, therefore, reasonable and necessary to look to the length of the petitioner's stay in the third country and to the circumstances of his life there to decide whether or not the presumption of firm resettlement survives.

A

**[2]** Although not dictated by the text of 8 C.F.R. § 208.15, the *Cheo* presumption is consistent with the Supreme Court's only exegesis of the firm resettlement doctrine. In 1971, the Court decided the case of a native of Red China who had fled for Hong Kong in 1953, where he lived until 1965, when he applied for asylum in the United States. *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 50 (1971). Although the Displaced Persons Act of 1948 and its successor statute, the Refugee Relief Act of 1953, had both explicitly included the concept of "firm resettlement," when the 1953 Act was extended in

gration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

1957, the reference to "firm resettlement" was omitted from the statute. *Id.* at 54-55. The revised definition of "refugee," however, required that the petitioner have "fled" persecution and, focusing on this provision, the Court held that the firm resettlement doctrine persisted in the new definition of "refugee" because "both the terms 'firmly resettled' and 'fled' are closely related to the central theme of all 23 years of refugee legislation—the creation of a haven for the world's homeless people." *Id.* Writing for the Court, Justice Black explained that:

> [The act] was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives. Nor could Congress have intended to make refugees in flight from persecution compete with all of the world's resettled refugees for the 10,200 entries and permits afforded each year under [the statute]. Such an interpretation would subvert the lofty goals embodied in the whole pattern of our refugee legislation.

*Id.* at 56. The Court also announced that "the correct legal standard" to apply in cases where a petitioner has fled persecution is that the petitioner's "physical presence [in the United States] must be one which is reasonably proximate to the flight and not one following a flight remote in point of time or interrupted by intervening residence in a third country reasonably constituting a termination of the original flight in search of refuge." *Id.* at 56-57 (internal quotation marks omitted).

We have recognized that the Court's reasoning in *Woo* applies also to the current definition of firm resettlement. Referring to *Woo*, we have held that "[f]irm resettlement has long been a decisive factor in asylum policy. . . . Nothing in the Refugee Act or its legislative history alters the long-standing significance of firm resettlement to the asylum process." *Yang v. INS*, 79 F.3d 932, 939 (9th Cir. 1996); *see also*

*Ali v. Reno*, 237 F.3d 591, 594 (6th Cir. 2001) (extending the Supreme Court's holding in *Woo* to the Refugee Act of 1980).

1

**[3]** The Supreme Court's reasoning in *Woo* is consistent with both the origins of, and the continuing rationale supporting, our refugee and asylum laws. The original congressional declaration of policies and objectives for the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), announced that

> it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands . . . . The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

Refugee Act § 101. This statement, like the legislation it accompanied and the current iteration of the statute, recognizes the co-operative nature of the obligations described in the 1967 United Nations Protocol Relating to the Status of Refugees (the "1967 Protocol"), to which the United States acceded in 1968. *See* Preamble to 1967 Protocol, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968) ("[T]he grant of asylum may place unduly heavy burdens on certain countries, and . . . a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature cannot therefore be achieved without international co-operation.").

A consequence of the international and co-operative nature of our obligations under the 1967 Protocol is that these obligations, though freely undertaken and diligently executed, are not boundless. The most obvious limitations are the discretion bestowed on the Attorney General to accept or to reject the

asylum application of a qualified refugee, *see* 8 U.S.C. § 1158(b)(1) ("The Attorney General *may* grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee . . . .") (emphasis added), and the numerical limit on the number of refugees that may be admitted into the United States each year. *See* 8 U.S.C. § 1157(a). These limitations are consistent with the Supreme Court's observation in *Woo* that "refugees in flight from persecution" should not be forced to compete with "the world's settled refugees," 402 U.S. at 56, for the finite number of places available in the United States each year. Adherence to this limiting rule most justly discharges our nation's obligations and most effectively encourages those of our fellow contracting nations.

B

Those cases in which we have held that evidence of an offer *vel non* of permanent resettlement is the determinative factor in applying the firm resettlement bar have also affirmed the continuing vitality of the *Cheo* presumption and of the Supreme Court's holding in *Woo*.

1

In *Andriasian*, the petitioner was an Azeri who had fled with his family to Armenia to escape persecution in his native country. 180 F.3d at 1036. For forty-four months the family traveled between Russia, Armenia and the Ukraine, moving nine times to avoid further persecution. *Id.* When they finally reached the United States and applied for asylum, the IJ found that, " 'except for a brief reference on cross-examination to having problems with religious practice in Armenia . . . the respondent did not assert any problems while living in Armenia . . .' [and] the Armenian government had neither prevented Mr. Andriasian's resettlement nor imposed restrictions on the Andriasian family." *Id.* at 1039. On the basis of these

findings, the IJ held that the Andriasian family had been firmly resettled in Armenia. *Id.* On appeal, the BIA reversed the IJ's application of the firm resettlement bar but denied Andriasian's appeal on other grounds. *Id.*

On petition to this court, the government did not challenge the BIA's reversal of the IJ's firm resettlement finding. Though the issue was not properly before us, we gave our imprimatur to the BIA's decision and observed that

> the INS regulation . . . *mandates* a denial of asylum if a third country in which an alien has resided after becoming a refugee offers him permanent resettlement; such "resettlement" precludes asylum, unless the application can demonstrate that his stay in the third country lasted only until he could arrange for further travel or that the conditions of life in that country would be unduly restrictive.

*Id.* at 1043. This statement generally follows the text of 8 C.F.R. § 208.15, including the two exceptions to firm resettlement, and is consistent with the Court's acknowledgment in *Woo* that:

> Certainly many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way. Such stops do not necessarily mean that the refugee's aim to reach these shores has in any sense been abandoned. . . . [T]he presence of such persons in this country is not "one which is reasonably proximate to the flight" or is "remote in point of time or interrupted by intervening residence in a third country."

402 U.S. at 57 n.6.

**[4]** These articulations of asylum policy also support the extension of the *Cheo* presumption of firm resettlement to the

facts of this case. The Maharaj family was not temporarily delayed in Canada in the course of an "escape to freedom" and the family's four-year, undisturbed residence in Edmonton was not one of a series of "successive stages" on a continuous journey from Fiji to the United States. All the relevant evidence in the record, including Mr. and Mrs. Maharaj's testimony, establishes that Canada was the family's chosen destination when they left Fiji in 1987 and that it was only in 1991, after they became discouraged by their jobs in Canada, that they chose to abandon their pending asylum claim there to come to the United States.

2

In *Deqa Ali*, we considered the case of a Somali petitioner who had fled persecution in her native country. She and her family first sought refuge in Ethiopia, where members of certain high-caste Somali clans have been offered refugee status, but, as a member of the low-caste Muuse Diriiye clan, she was not offered that protection. 394 F.3d at 783. Ali spent five years in Ethiopia as an undocumented alien trying to arrange further travel to somewhere that would offer her permanent settlement before she was able to make her way to the United States. *Id.* at 783-84. Despite the length of her stay in Ethiopia, we held that the firm resettlement bar did not apply because "the fact that Ali fortuitously evaded detection by the government while living illegally in Ethiopia does not allow for a finding that Ali was firmly resettled." *Id.* at 790. We also held that "the *Cheo* presumption 'does not mean that as soon as a person has come to rest at a country other than the country of danger, he cannot get asylum in the United States.' " *Id.* (quoting *Cheo*, 162 F.3d at 1230).

We further opined that, as a general rule, "the [*Cheo*] presumption only applies when 'there is no direct evidence one way or the other as to whether the [asylum applicants] have or had the right' of permanent resettlement in their country of first asylum." *Id.* (quoting *Cheo*, 162 F.3d at 1229). Of

course, in *Deqa Ali* we did not consider the case of a petitioner who voluntarily terminates an active asylum application in a safe third country. Without passing on the applicability of *Deqa Ali*'s general statement of the firm resettlement rule in other contexts, its scope does not extend to the facts of this case.

[5] Here, we know that the Maharaj family's asylum claim was still pending when it chose to leave Canada and so we have direct evidence that the members of the family never actually received an offer of permanent resettlement.[5] Nevertheless, it would be contrary to the limited, co-operative and reciprocal nature of our national asylum obligations, and to the Supreme Court's holding in *Woo*, to apply the general rule announced in *Deqa Ali* to the facts of this case. Forum-shopping among aliens who are no longer actively fleeing persecution undermines the integrity of the international asylum regime established by the 1967 Protocol, and it would be contrary to our national obligations under that treaty to indulge the Maharaj family's economic preference for asylum in the United States over Canada.

---

[5]Maharaj contends that he cannot return to Canada because, since his family's departure fourteen years ago, his application for asylum there was denied for failure to appear at a hearing. When determining whether an asylum applicant was firmly resettled, we look to his status in the third country immediately prior to his entry into the United States. *See Vang v. INS*, 146 F.3d 1114, 1117 (9th Cir. 1998) ("[T]he fact that Vang allowed his French travel document to expire after he entered the United States cannot alter the disposition of his asylum claim."); *Yang v. INS*, 79 F.3d 932, 934 (9th Cir. 1996) (holding that petitioners were firmly resettled despite their claim that they would no longer be able to return to the country of firm resettlement due to the expiration of travel documents). In this case, Mr. and Mrs. Maharaj testified that their family lived in Canada for four years, enjoying the protection of the government of Canada, including free health care, free public schooling, work authorization, Social Insurance Numbers, driver's licenses and the freedom to move unimpeded around the country. They had also applied for asylum in Canada and that claim was pending when they left to come to the United States. That is the status we must consider in evaluating Maharaj's petition.

C

**[6]** When a petitioner has enjoyed an extended, undisturbed stay in a safe, third country and has begun the process of applying for permanent residence, citizenship, or another form of permanent resettlement, which he subsequently repudiates or abandons in favor of entry into the United States, the burden is on the petitioner to rebut the *Cheo* presumption of firm resettlement. *Cf. Cheo*, 162 F.3d at 1230 ("[W]here the duration and circumstances indicate that the asylum seeker may remain in the third country, then it is incumbent upon him to show the contrary."). This burden cannot be met simply by showing that, because his immigration or asylum status had not yet been resolved when he left the third country, he never received an offer of permanent resettlement; he must show that at least one of the two exceptions to "firm resettlement" applies. *See* 8 C.F.R. § 208.15(a)-(b).

**[7]** Maharaj freely chose to apply for asylum in Canada and, while that process was pending, enjoyed a sufficiently extended and undisturbed stay there to establish a *Cheo* presumption of firm resettlement. The burden is on him to rebut this presumption. Because we agree with the IJ's conclusion that "the suggestion that [the Maharaj family] w[as] persecuted in Canada simply is not acceptable on the facts of the case," and because Maharaj has not presented any other relevant evidence to rebut the presumption of firm resettlement, he has not met his burden.

III

**[8]** Maharaj also contends that, in light of the coup that occurred in May 2000, he is eligible for withholding of removal because it is more likely than not that he will be persecuted upon return to Fiji. However, Maharaj has failed to show that his minor role in an election 18 years ago, which he claims triggered his persecution in the wake of the 1987 coup, would motivate similar persecution today, and the

Country Reports contain evidence of a significant lessening of political and racial tension since 2000. We are, therefore, satisfied that the BIA's denial of withholding of removal is supported by substantial evidence in the record concerning the circumstances of the original persecution and current country conditions. *See Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir. 1995).

The petition for review is **DENIED**.